**PACIFIC COAST ASSOCIATION OF PULP AND PAPER MANUFAC-TURERS, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 17646.

United States Court of Appeals
Ninth Circuit.

June 27, 1962.

McMicken, Rupp & Schweppe, Alfred J. Schweppe, Mary Ellen Krug, and Thomas R. Beierle, Seattle, Wash., for petitioner.

Stuart Rothman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, N. L. R. B., Washington, D. C., Thomas P. Graham, Regional Director, Samuel M. Singer, and A. Brummel, Attys., N. L. R. B., Seattle, Wash., for respondent.

Before HAMLIN and DUNIWAY, Circuit Judges, and ROSS, District Judge.

DUNIWAY, Circuit Judge.

Pacific Coast Association of Pulp and Paper Manufacturers (the Association) petitions for review of an order of the National Labor Relations Board (the Board). The Board counters with a petition for enforcement. (Section 10(e, f), National Labor Relations Act, 29 U.S.C.A. § 160(e, f)). We conclude that the order is valid, and should be enforced. The charge is that the Association has refused to bargain collectively with two unions, the United Brotherhood of Papermakers and the International Brotherhood of Pulp, Sulphite and Paper Mill Workers (the Unions) (Section 8(a) (1) and (5), National Labor Relations Act, 29 U.S.C.A. § 158(a) (1) and (5)), on the matter of pension and retirement plans. This is a subject as to which bargaining is mandatory. (Inland Steel Company v. N. L. R. B., 7 Cir., 1948, 170 F.2d 247, 12 A.L.R.2d 240).

The refusal, if refusal it was, occurred at a bargaining session between the parties in May, 1959. At that time, the Association represented a group of over twenty corporations owning some forty-six mills in Washington, Oregon and California. The Association and the Unions had been bargaining successfully since 1934. As the Trial Examiner states:

"Concerning this rather remarkable history of collective bargaining, the Board in Rayonier, Inc., citation supra, [52 N.L.R.B. 1629] said:

"'This system of dealing which has become traditional in the Pacific Coast pulp and paper industry, has proved conducive to the orderly functioning of collective bargaining, and has contributed to the uniformity and stability of labor conditions, not only among the Association mills but also among other Pacific Coast mills of a like class, which as a general rule have followed the lead of the Association.'

"The good will existing between the bargaining principals throughout this period is manifest in this

proceeding where, though they have come to disagree on what is primarily an issue of law, the brief of the charging parties contains this conciliatory language: 'The two Unions who have reluctantly brought the charges which are the basis for this formal complaint proceeding are the first to acknowledge with vigor and sincerity the excellent bargaining relationship which they have enjoyed with the Association and its member companies over an historic quarter century period.' (When litigants such as these preface their arguments with roses instead of brickbats, can a millenium in labor relations be far behind!)"

It is undisputed that, until 1959, it had been understood by the parties that collective bargaining as to pensions would not be conducted between the Association and the Unions, but between each member company and the Unions. It is also undisputed that no member company has refused so to bargain. The Unions, at the 1959 bargaining session, asked that the new collective bargaining agreement contain certain provisions as to pensions. The Association flatly refused to discuss the matter. Its spokesman said:

"Certainly the Union officers know, and presumably the delegates also know or should know, that this Manufacturers' Association is not the bargaining agent for retirement plans or pension plans, as you refer to them on your Agenda, for these companies nor these member mills. Obviously, because of that, your Item number fourteen cannot be bargained for at this Conference between the Association and the Unions unless the companies which own the member mills here and now would abandon their long-established position as to pension bargaining at the company level, and in place thereof would authorize this Association as their legal bargaining agent for pensions.

"The Manufacturers are unwilling to make this change.

\* \* \* \* \* \*

"At no time have these companies, any one of them, to the best of our knowledge, ever refused to bargain with you over the issue of pensions. We have not and do not now take the position that we do not have to bargain with you over pensions.

"However, our understanding of the law is that we do not have the right to interfere with an appropriate group of employees in these mills as to their choice of bargaining agent. And by the same token our understanding of the law is that these companies have the right to name their agent for purposes of collective bargaining. It is also our understanding of the law that when they name an agent for the purpose of collective bargaining, they do not have to name one agent for all items that are covered by the law under the term 'collective bargaining.'

"They have not up to now, and they are not now willing, to name this Association as their agent for the purpose of collective bargaining. And again I hasten to say that that does not mean in any manner that they refuse to bargain with you, as a company, over the issue. And again I say, they are not—they have not up to date refused, they are not now refusing.

\* \* \* \* \* \*

"However, again coming back to the main question, the basic difference of opinion between us seems to be this question of whether these companies have the right to have more than one bargaining agent for purposes of collective bargaining.

"As we have been advised, as we understand the law, we do have that right.

\* \* \* \* \* \*

"Because it's not gone to the place, as I tried to explain before, where in any manner any company in this

room is refusing to bargain with you on the issue of pensions. It's just a question of who does the bargaining. And they have up to now withheld that from this Association, and they have again stated their position this year that they are unwilling to change that.

\* \* \* \* \* \*

"Item number fourteen, we firmly and completely rejected your proposal to place bargaining over retirement plans on an Association level instead of at the company level. In doing this we also told you that each company recognized its authority and responsibility to bargain with you in good faith at the company level and each company is prepared to carry out this responsibility, awaiting only your request for arrangements to make it effective."

The position thus stated has its origin in action taken, internally and unilaterally, by the Association, in 1948, and reflected in its minutes by the following resolution:

"That until further resolution by this Association, the authority to bargain with any labor organization on the subject of retirement plans be and the same is hereby redelegated to each individual member mill of the Association; and that any member mill which adopts or amends a retirement plan shall promptly file a copy of same with the Secretary of the Association, who shall distribute copies to all member mills."

This action, in turn, is based upon prior discussions between the Association and the Unions, beginning in 1944, as a result of which there was at least an informal understanding that bargaining about pensions would be at the company level rather than at the Association level. The Trial Examiner, whose findings were adopted by the Board, found that there was such an understanding, but he refused to find that there was a binding contract, terminable only if either side should fail to bargain in good faith at the company level. It is the refusal to find such a binding contract that is the Association's primary ground of attack upon the Board's order.

The Association does not now contend that it could refuse to bargain upon one subject, such as pensions, in the absence of such a contract, nor could it successfully so contend. (See N. L. R. B. v. Jeffries Banknote Company, 9 Cir., 1960, 281 F.2d 893). Thus, the principal question is whether the Board's finding, that there was not such a binding contract as the Association claims, is "supported by substantial evidence on the record considered as a whole". (29 U.S.C.A. § 160 (f)). We think that the finding is fully supported. The 1944 understanding was tentative, and the Association does not claim otherwise. It claims that the contract was made in 1947, and points to language used by a union representative, at a September, 1949 bargaining session, as follows:

"And so the commitment in 1946 was made, and it stated that we could not discuss pensions in this Conference under the Uniform Labor Agreement, that the conditions in the setup of industry and in the mills were vastly different, that the employers would agree, however, to discuss the matter of pensions on mill level. And upon the basis of that statement, I went back to the delegates and I asked them to drop the pension debate in this Conference. They agreed to go along with me on that proposal that was made."

We find nothing in this language, nor in other language cited to us by the Association's counsel, that compels the conclusion that a firm oral contract was made, whereby the Unions gave up their right to bargain through the Association upon the subject of pensions so long as the member companies bargained in good faith. The parties put in evidence all discussions of the question at bargaining sessions, from June 7, 1944 through May 29, 1959. A reading of that material convinces us, as it did the trial examiner and the Board, that the under-

standing was informal, and that nothing in it bound either of the parties not to demand bargaining at the Association level at any session at which an agreement was to be negotiated. The fact that, for nearly 15 years, the Unions did not insist upon doing so, does not require a finding that they had bound themselves not to do so the next time.

The record shows that, time after time, union representatives brought the matter up, expressing dissatisfaction with the results of company-level bargaining, and indicating that, unless progress more satisfactory to the Unions could be made, they would bring the matter back to the bargaining sessions with the Association. As early as April, 1949, a union representative noted the difficulty under which the Unions were operating, in that the individual company found it too easy to say "no" when separate bargaining was undertaken with it, as to pensions, because the Unions had entered into a firm collective bargaining agreement, upon all other subjects, through the Association. Similar comments were made at subsequent meetings, with particular reference to the "no strike" clause in the agreement. Another union representative stated that "unless something can be done, perhaps, that commitment [to bargain at the company level] is going to have to be withdrawn". At the September, 1949 meeting, at which the union representative made the statement quoted above, and most heavily relied upon by the Association, he again complained about lack of results in company-level bargaining, pointing out that ten of the thirty-two mills then represented had no pension plans, and that the subject was one as to which bargaining is compulsory.

Before 1954, when these matters came up, the Association, in objection to discussion, referred to the understanding. Beginning in 1954, however, it took a different tack. At the meeting in May of that year, it produced its 1948 resolution, heretofore quoted, and took the position, thereafter consistently adhered to

by it, that it had no authority, no legal right, to bargain for its members on the subject of pensions. There were also references to the "commitment" or "understanding", but at no point did the Association take the position that there was such a specific and binding contract as counsel now says there was. Thus, at the 1954 meeting, a union representative referred to the so-called contract as "a solution for the time being", and another took the position, quite correctly, we think, that the Association's 1948 resolution "does not in any way, shape or form deprive the Unions of the right to bargain and to talk with the employers in this conference on the matter which is contained in number 6(c) of our agenda to you."

The claim of lack of legal authority to bargain on pensions or retirement was reiterated by the Association in 1955 and in subsequent meetings. But at the 1955 meeting, the Union representative stated "However, at that time the commitment was made, it was a verbal commitment, not a binding commitment over the years of course, because commitments can change. Labor unions have a right to change their commitments here in bargaining procedure the same as employers have a right to change their commitments over the years." That statement was not challenged. And at the conclusion of the discussion he said "if the employers during this contract year, fail to live up to their responsibilities on this issue, that next year * * *, knowing full well that it is a bargainable point under the contract that we shall decide the issue in this conference without returning to the mill level". The preceding discussion makes it clear that, when he referred to the employers' responsibilities, he did not mean merely responsibility to bargain; he meant responsibility to arrive at agreements deemed desirable by the Union. A similar statement, as to the right of the Union to change its position, was made in 1958, and again not challenged. The idea that there was such a contract as is now claimed seems to have

been first thought of when counsel undertook to defend the Association before the Board.

There are practical reasons for finding against the claimed contract, where the evidence does not compel such a finding. The written contract between the parties, made in 1959, is effective for two years, and contains a no-strike clause. If there is such a contract as is now claimed, and if the Unions bargain separately with one of the companies, and if the results are not satisfactory to them, what recourse have they? They cannot use the adjustment procedures in the written contract, as that contract, by definition, does not relate to the subject matter at all. Can they strike the particular company and not be in violation of the written contract? The question was repeatedly raised by the Unions at bargaining sessions with the Association; they got no answer. Furthermore, the removal of the subject of pensions from the general bargaining makes it impossible for the Unions to get something that they want in that area by conceding something in another, a usual practice in bargaining. This, too, has been expressed as a cause for dissatisfaction by the Unions. These are some of the reasons why, except by agreement, bargaining cannot be bifurcated, as the Association is seeking to do, unilaterally.

Nor do we think that the facts that each company has a different pension or retirement plan (some have none), that in the case of some companies employees at locations for which the Association does not bargain are included, that in many cases employees not represented by the Unions are involved, and that in some cases several other Unions are involved, are insuperable obstacles. The Unions did not demand their own plans; they asked that all companies have plans—and that such plans involve certain features. Bargaining does not require agreement; it does require good faith consideration of proposals. (29 U.S.C.A. § 158(d); N. L. R. B. v. American National Insurance Company, 1952, 343 U.S. 395, 72 S. Ct. 824, 96 L.Ed. 1027.)

The Unions did waive their right to bargain with the Association on pensions until 1959. That waiver, as we have seen, was not of the permanent or binding character claimed. The Association was on notice that the Unions might demand Association bargaining whenever company bargaining proved unsatisfactory to the Unions. We cannot find any element of estoppel here. Of course, the members of the Association relied upon the informal understanding in negotiating at the company level regarding pensions. But we cannot see how they did so to their detriment. Whether any of them will suffer any detriment as a result of Association bargaining remains to be seen. In short, the ordinary elements of estoppel are not present.

It is claimed that the matter is moot because, while it was pending, the Union negotiated about pensions at the company level with two of the members of the Association. We think not. This is a proceeding by the Board, not the Unions. Moreover, we are cited to no authority holding that bargaining of this sort, during the pendency of a charge of refusal to bargain in another way, renders that charge moot. (See: N. L. R. B. v. The Item Co., 5 Cir., 1955, 220 F.2d 956; N. L. R. B. v. J. H. Allison & Co., 6 Cir., 1948, 165 F.2d 766, 3 A.L.R.2d 990; N. L. R. B. v. Southeastern Rubber Mfg. Co., 5 Cir., 1954, 213 F.2d 11) Practical considerations are all against such a conclusion. This matter has been pending since October, 1959. Labor-management relations are a continuum. Any rule that would hold them in a state of suspended animation during the pendency of an unfair practices charge would, in our view, be most unfortunate.

It has been suggested that the decision will force the members to withdraw from the Association, thereby destroying what has been, for many years, a model of amicable and successful collective bargaining. We are unable to understand this threat, and we can find nothing in the record that will force any member to withdraw. Heretofore the parties have exhibited a high degree of statesmanship and good

will. We see no reason why they cannot continue to do so. We venture to suggest that the members of the Association get into the water before they make an irrevocable decision that it is too cold. They may find, and not entirely to their own surprise, that it is tolerable, or even quite pleasant.

The order of the Board is enforced.