RETAIL CLERKS UNION, NO. 1550, et al., Retail Clerks International Association, AFL–CIO, Petitioners,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent,

and

The Kroger Company, Intervenor.

No. 17726.

United States Court of Appeals District of Columbia Circuit.

Argued Nov. 27, 1963.

Decided Jan. 23, 1964.

Mr. S. G. Lippman, Washington, D. C., with whom Mr. Russell Specter, Washington, D. C., was on the brief, for petitioners. Mr. Tim L. Bornstein, Washington, D. C., also entered an appearance for petitioners.

Mr. Warren M. Davison, Attorney, National Labor Relations Board, with whom Messrs. Dominick L. Manoli, Associate General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, and Peter M. Giesey, Attorney, National Labor Relations Board, were on the brief, for respondent. Mr. James C. Paras, Attorney, National Labor Relations Board, also entered an appearance for respondent.

Mr. J. Mack Swigert, Cincinnati, Ohio, of the bar of the Supreme Court of Ohio, *pro hac vice,* by special leave of court, with whom Mr. Frank H. Stewart, Cincinnati, Ohio, was on the brief, for intervenor.

Before FAHY, BURGER and McGOWAN, Circuit Judges.

McGOWAN, Circuit Judge.

The petitioners here, Retail Clerks International Association, AFL-CIO, and a number of its local unions, (hereinafter sometimes collectively referred to as the "Union"), seek to set aside an order of the National Labor Relations Board dismissing a complaint against The Kroger Co., a food retailing chain. The complaint charged Kroger with violations of Section 8(a) (1) and (5) of the National Labor Relations Act [1] for failing to exe-

1. 61 Stat. 136, 73 Stat. 519. 29 U.S.C. § 151 et seq. The sections immediately involved are:

§ 8(a) "It shall be an unfair labor practice for an employer—

"(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title; * * *

"(5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159 (a) of this title."

And see § 7

"Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158(a) (3) of this title."

cute a collective bargaining agreement embodying the agreements reached between the Union and certain other food retailing employers assertedly linked with Kroger in a multi-employer bargaining unit. This latter phenomenon is non-statutory in character, and thus lacks the definiteness in terms of nature and obligation which it might have if Congress had dealt expressly with it. The facts, always important, become more so when the relevant legal concept is blurred; and so we turn to them forthwith.

## I

Kroger has, since 1945, bargained with certain local unions in the Chicago area in association with other retail food chains. The employer group has not been formally institutionalized in any way, in the sense that there are no organizational arrangements, constitutions or articles of association, rules of procedure, dues or fees. There is no evidence that any employer has explicitly delegated authority to anyone else to act for it in a binding manner. The practice has been for the Union to submit contract proposals to each employer individually. Thereafter, representatives of each employer meet to discuss the proposals, first among themselves and then as a group with Union representatives. The outcome of these bargaining sessions was the execution of separate contracts between the Union and each employer. Although substantially similar in nature, these contracts have, as discussed more fully hereinafter, a history of variations designed to implement special arrangements between a particular employer and the local representing its employees.

In 1961, in accordance with past practice, the Union gave the employers separate notices of contract reopening. The first group meeting occurred on October 26. A labor relations officer of Kroger, one Marvin Saunders,[2] represented it at

that meeting. The Union proposed a pension plan for inclusion in the contract —the first time this subject had been advanced in the annual negotiations. Saunders immediately advised the Union that Kroger, because of its own pension and profit-sharing plan of long standing, would not be interested in the Union's proposal. The same was said to be true of A & P. Throughout the ten succeeding bargaining sessions (from November 11, 1961 to February 16, 1962), the employers continued to resist the pension proposal. On February 22, at the twelfth session and one in which Kroger was not personally represented, the Union was informed by Mr. Quirk that all employers were willing to give wage increases but some remained negative on the pension issue. When the Union representative responded to this by saying that the Union considered that each employer would be bound by any agreement reached, Quirk then stated that he would have to confer with the other employer representatives on this matter before he could proceed any further. At the next meeting, on February 24, when the Union reiterated its position that all employers would have to be bound by the agreement, Quirk replied that the Union had better state its position in this regard directly to the Kroger representative. The Kroger representative was then called into the room, and he stated explicitly that no one was authorized by Kroger to agree to a pension plan and that Kroger would not be bound by any such contract no matter who else might agree to it. Kroger then withdrew from the meeting and, at approximately 1:00 A.M., on February 25, the Union and the other employers reached agreement upon terms which included a pension provision.

The Kroger representative, upon being invited to re-enter the meeting to be advised of this result, reiterated his position that Kroger would not sign a con-

2. Although never formally designated as such, Saunders had functioned for some years as spokesman for the employers in the group discussions. Prior to the 1961 negotiations, he had informed the other employers that his other commitments would prevent his continuing to so act in the future. He was, however, induced to serve at the first meeting, but thereafter he was replaced in this role by Mr. Quirk, of National Tea.

tract which included a pension plan. He stated Kroger's willingness either to accept all of the agreed terms except for pensions, or to carry on further bargaining for a wholly new agreement. The other employers finally signed contracts with the Union on April 12. Some meetings were held between Kroger and the Union after February 24, but they were unavailing and, on April 19, Kroger was struck.

## II

The ultimate issue in this case is, of course, whether Kroger's conduct, as detailed above, constituted a bad faith refusal to bargain with the Union, or an interference with the bargaining rights of the employees, within the meaning of Section 8(a) (1) and (5) of the Act. The Union argues, first, that if there was in fact a multi-employer bargaining unit, then Kroger, as a member of it, is legally bound to accept the agreements issuing from the group negotiations. Perhaps in recognition of the amorphous nature of the legal concept of "multi-employer bargaining unit," the Union does not stand solely on this ground but urges further that, at the least, a member of such a unit can avoid the consequences of group negotiation only by a timely and effective withdrawal from the group, which, so it says, Kroger did not do.

The Board—rightly, we think—did not undertake to decide this case by first deciding whether or not to pin the label of "multi-employer bargaining unit" on Kroger and the other employers, and then to draw automatic conclusions from such a premise. Rather, it found what the facts were with respect to the joint negotiations carried on in 1961 and before, and measured Kroger's asserted statutory derelictions in the light of those facts. It concluded that there has been a practice of collective discussion between a number of employers, including Kroger, on the one hand, and the Union, including its locals, on the other, eventuating customarily over the years in a series of substantially similar, albeit separate, contracts between the individ-

ual employers and the individual locals. But it found from the evidence that there had been no monolithic adherence by the members of either group to the objective of uniformity in the contracts as a whole. It was from these facts, and not from any legal abstraction, that it inferred an understanding between the parties that these group discussions need not result in identical agreements and that, accordingly, an individual employer or an individual local might, by timely action taken in good faith, reserve its position on a particular matter in such manner so as not to be bound at all events by what a majority of their associates might agree to.

In reviewing the result the Board reached by this means, we think our function is limited to determining whether there was sufficient evidence in the record to support the Board on both these points, that is to say, whether the group bargaining arrangements here involved were understood by the participants in them as operating to require contract uniformity under all circumstances, and whether, if there be no such understanding, Kroger acted with appropriate speed and clarity so as not to mislead the Union under the particular circumstances of the 1961 negotiation.

With respect to the first of these questions, it is not claimed by anyone that the employers were bound as between themselves to act as a unit, or that Kroger, in allegedly defaulting its responsibilities to the Union, is also breaking faith with its fellow employers. This, of course, does not conclude the matter before us, because it is Kroger's conduct *vis-a-vis* the Union, not the other employers, which is at issue. But it has significance to this extent, namely, the Union has to imply Kroger's submission to be bound by group action from a course of conduct. It cannot, as stated above, identify such submission in any express commitment by Kroger, either to the Union or to the other employers.

The Board was unable to draw the implication of implied submission from

the record. There was, of course, the threshold fact that the employers, over and above the absence of any formal organization or definition of inter-employer rights and obligations, had always signed separate contracts with individual locals. The Board's chief reliance, however, was· on the showing made as to the number and extent over the years of variations in these contracts as a result of non-group, employer-local, discussions. In its Decision the Board lists 13 instances, spanning the decade before this controversy arose, of what it found to be "individual adjustments between separate employers and separate union (sic) which varied the jointly negotiated terms and conditions of employment." It was from this evidence that the Board concluded that

> "during the entire period of multi-employer bargaining, individual employers and individual unions had negotiated individual modifications to the jointly negotiated agreements without protest from other parties to the agreements. The evidence, we believe, justifies a finding * * that in jointly negotiating for a collective-bargaining agreement, the parties mutually understood that individual variances in the agreement could be negotiated by the individual parties."

We have no occasion to characterize this finding as arbitrary or lacking in substantial record foundation. The 13 instances, not suprisingly, vary considerably in their relative importance, and this prompts the Union to decry their significance *in toto*. But we agree with the Board that they do present a pattern of conduct, stretching over several years and participated in by many different parties on both sides of the fence, which does serve to illuminate the states of mind in which these groups periodically faced each other across the bargaining table. In the light of this history, the assumptions common to both must have been that, although brought together by a joint interest in uniformity, neither group marched as latter-day musketeers bound by irretrievable pledges of solidarity. All sought as much uniformity as possible, but their ideal in this regard was relative, not absolute.

This is strongly suggested by some of the instances recounted by the Board. In 1952 Kroger reached a separate accord with the Union whereby co-managers in the Kroger stores were excluded from the compulsory union membership provisions in their current contract. In 1955 a union local asked for and got from Kroger alone a dues check-off, something not provided in the current contracts. In 1960 Kroger and Local 1460 entered into an agency shop arrangement with accompanying check-off. In 1958 National Tea Company woked out a supplemental agreement on uniforms for its female employees, differing from the provisions on this subject in the contracts of the other employers. In 1959 the joint discussions resulted in contracts containing a clause under which indemnification was provided the employers for any claims flowing from the agency shop; this was then omitted from the A & P contract. A & P refused to sign the 1959–61 agreement until a change was made in the health and welfare provisions. The Union agreed, and the A & P contract, as signed, differed from the others. When National Tea and Associated Food Retailers learned of this modification, they asked for a similar change in their contracts and received it; a like request from Kroger did not result in any modification. Other incidents in the list bolster the impression, given by the foregoing, that there was a long-standing tradition of separate dealing between each employer and the Union, and justified the Board in deciding that there was no misunderstanding by the parties that all negotiating discussions would be confined to the group sessions and that all contracts would be the same.

This is not to say that there was no recognizable framework of joint bargaining between the Union and the group of employers that included Kroger. Obviously there was; and it would be foolish to say that that framework imposed

no limitations of any kind upon Kroger's independence of action. Had Kroger sat through the joint sessions with no intimation of its purposes with respect to pensions, we would have a different case. This would be especially true if the course of the negotiations suggested that the Union might have been weakening or trading off some of its other demands in the hope of getting agreement on pensions. One may not seek the benefits of joint bargaining without risking exposure to the burdens. It is certainly possible to conceive of circumstances in which the refusal of a party to joint negotiations to sign the resulting agreement could be said to fall short of the statutory command that there be good faith bargaining.

The Board was, however, alert to this possibility, and this brings us to the second phase of our limited judicial inquiry. At the very first negotiating session, the Kroger representative stated clearly and emphatically that Kroger, because it had had its own plan in effect for years, would not agree to the setting up of a new and jointly-administered plan. Kroger never wavered from this position, which the Board found to have been taken in good faith and not for mere trading purposes. This finding is solidly buttressed by the fact that Kroger ultimately took a strike on this issue.

Neither was the Union misled in any way as to Kroger's position on the question of whether the group could bind it on the pension issue. As noted above, at the first session Kroger stated that it was not interested in the Union's pension proposal. More importantly, at the twelfth joint session on February 22, 1962, the employer spokesman informed the Union that, although all employers were willing to increase wage rates, some would not agree to pensions. The Union then stated its position to be that any one employer would be bound by the agreements reached with the others. When this position was reiterated at the February 24th meeting, the employer spokesman advised the Union that its position in this regard should be communicated directly to Kroger forthwith.

Thus it was that, at the meeting on February 24, a Kroger representative was called in and he stated that no one was authorized to bind Kroger by an agreement which included a pension provision. Kroger thereupon left the meeting. After further bargaining, the employer group, sans Kroger, reached agreement with the Union on terms which included a pension plan. Kroger then advised the Union that it would not sign a contract embodying such an agreement, but it did express its willingness to accept the other agreed terms, without the pension plan. It did not limit itself to this, however, which might have exposed it to the charge of taking benefits without burdens. It expressly signified its readiness to negotiate afresh, with all terms being regarded as open.[3]

### III

Pension plans are, of course appropriate subjects for collective bargaining, and no employer is privileged to refuse to discuss them. This has been settled since Inland Steel Co. v. N.L.R.B., 170 F.2d 247 (7th Cir.1948), cert. denied, 336 U.S. 960, 69 S.Ct. 887, 93 L.Ed. 1112 (1949). But this dispute does not involve that issue. The question here is not whether Kroger properly refused to bargain about pensions at all,[4] but wheth-

---

3. Three subsequent meetings took place between Kroger and the Union, but the last two of these came after the intervention of the Federal Mediation and Conciliation Service in a futile effort to head off the strike.

4. The Union has relied heavily in its brief and argument upon Pacific Coast Association of Pulp & Paper Manufacturers,

133 N.L.R.B. 690 (1961), enforced, 304 F.2d 760 (9th Cir. 1962). This appears to us, however, as an instance of a failure by employers collectively to recognize pensions as a mandatory subject of bargaining. At issue, certainly, was the conduct of the employer group in excluding pensions from the otherwise comprehensive authority delegated to the bargaining

er it was entitled to insist that its bargaining on this subject be untrammeled by group action on the subject. Translated into the language of the statutory infractions with which it is charged, the issue is whether such insistence by Kroger unlawfully interfered with the collective bargaining rights of its employees, or constituted an unlawful refusal to bargain with the Union.

■ The Board has appraised the conduct of Kroger in the light of factual findings amply supported by evidence in the record, and it has concluded that that conduct does not transgress the statutory mandates. In reaching this conclusion, the Board has adhered to the salutary practice it has established of examining these multi-unit situations on a case-by-case basis. Group activity in the collective bargaining field has no statutory matrix by which the contours of the resulting rights and obligations can be deductively defined. It is clear that group activity can and does range over a wide spectrum of habits, practices, and understandings, explicit and implicit, which makes generalization more hazardous than usual.

Confronted with this prospect of infinite variety, the Board has wisely looked to the facts of the particular case in deciding whether a complaint about reprehensible conduct is justified. It has, on occasion, found those facts to be such as to warrant a determination that the statute has been infringed. See, for example, Anderson Lithographic Co., 124 N.L.R.B. 920 (1959), *enforced sub nom,* N.L.R.B. v. Jeffries Banknote Co., 281 F.2d 893 (9th Cir.1960); Kasco Trucking Corp., 133 N.L.R.B. 627 (1961); Detroit Window Cleaners Union, 126 N.L.R.B. 63 (1960); and Walker Electric Co., 142 N.L.R.B. No. 134 (p. 6), 53 L.R.R.M. 1233, 63–1, CCH Lab. Cas. ¶12,398 (1963). These cases, however, exhibit a common factual trait (i. e., a failure by a party to group bargaining to communicate in a timely fashion to the other side a purpose to reserve a particular subject matter for individual action) which has caused the Board to conclude that there has been a failure in bad faith to conform to the obligations of the statute.

In the same spirit of allegiance to fact rather than form, the Board has probed beneath the surface of group action to find that a course of conduct by a particular employer, although eventuating in dissociation from the colective result, was fully consistent with the requirements of the Act. J & H Food, Inc., 139 N.L.R.B. 1398 (1962) (involving facts very similar to the instant case and also involving Kroger); Indiana Limestone Company, 136 N.L.R.B. 697 (1962). There, as here, the evidence showed such a mélange of group and individual negotiation and agreement, carried on over such a period of time, as to suggest a commonly accepted flexibility in the format of bargaining which would not automatically outlaw every departure from the fold. Where, also as here, that departure is not surreptitious, or accompanied by a refusal to bargain on an individual basis, the Board may well conclude that the accused employer has not failed to meet the standards which Congress has set for him in treating with his employees.[5] Unless and until Congress prescribes definite—and different—ground rules for group bargaining generally, those which the Board

---

agent. Here, the group not only bargained about pensions but reached an agreement; and the complaint about Kroger is not that it would not bargain about pensions at all but only that it insisted on carrying on this bargaining on an individual basis and with reference to its own existing plan and not to a new jointly administered plan.

5. We do, of course, take into consideration the expertise of the Board. Its continuous exposure to the business of extracting a kernel of probable truth from special factual settings, which the Board observes more often and more closely than do we, gives it a facility and understanding worthy of respect. See Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S. Ct. 456, 95 L.Ed. 456 (1951).

has applied in this particular instance do not impress us as lacking in either reason or fairness.

The action of the Board in dismissing the complaint is left undisturbed.