WESTERN STATES REGIONAL COUN-
CIL NO. 3, INTERNATIONAL WOOD-
WORKERS OF AMERICA, AFL–CIO

and

Western Council of Lumber and Sawmill
Workers AFL–CIO, Petitioners,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent,

Weyerhaeuser Company, Crown Zeller-
bach Corporation, Rayonier Incorporat-
ed, and International Paper Company
and Associates, Intervenors.

No. 19842.

United States Court of Appeals
District of Columbia Circuit.

Argued May 24, 1966.

Decided July 20, 1966.

Mr. Joseph L. Rauh, Jr., Washington, D. C., with whom Mr. John Silard, Washington, D. C., was on the brief, for petitioners.

Mr. Glen M. Bendixsen, Attorney, National Labor Relations Board, of the bar of the Supreme Court of California, pro hac vice, by special leave of court, with whom Messrs. Arnold Ordman, General Counsel, Dominick L. Manoli, Associate General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, and Peter M. Giesey, Attorney, National Labor Relations Board, were on the brief, for respondent.

Mr. Charles F. Prael, San Francisco, Cal., with whom Mr. Guy Farmer, Washington, D. C., was on the brief, for intervenors.

Before BAZELON, Chief Judge, and WRIGHT and McGOWAN, Circuit Judges.

McGOWAN, Circuit Judge:

Petitioner unions challenge an order of the National Labor Relations Board absolving the employer-intervenors of violating Sections 8(a)(1) and (3) of the Act. 29 U.S.C. § 158(a)(1), (3). The relief they seek from us is a remand to the Board in order that it may address itself to issues which were litigated before, and resolved by, the Examiner; and which, so petitioners assert, were im-

properly ignored by the Board. We are of the view that, for the reasons discussed below, a remand is in order.

## I

This controversy originated in an effort to create a multi-employer bargaining unit among six lumber companies on the West Coast. See NLRB v. Truck Drivers Local Union No. 449, etc. *(Buffalo Linen)*, 353 U.S. 87, 77 S.Ct. 643, 1 L.Ed.2d 676 (1957). Whether that effort had been successful was the issue litigated at length in the hearings before the Examiner.[1] He concluded that it had and, applying *Buffalo Linen*, held that a lockout of their employees by four of the employers when the other two were struck in the course of the bargaining negotiations did not transgress the Act.

The lockout took place in the summer of 1963. The hearings consumed some six weeks in April and May of 1964. The Examiner's report and recommendation were forthcoming on April 5, 1965. One week earlier the Supreme Court decided American Ship Building Co. v. NLRB, 380 U.S. 300, 85 S.Ct. 955, 13 L.Ed.2d 855 (1965), and NLRB v. Brown, 380 U.S. 278, 85 S.Ct. 980, 13 L.Ed.2d 839 (1965). In its decision six months later, the Board said that, because of these decisions, it did not need to consider the matter in the Examiner's terms, i.e., whether there was in fact a valid multi-employer bargaining unit entitled to exercise *Buffalo Linen* powers. It regarded the intervenors as at least bargaining jointly through a designated representative, and as having reached an impasse before the lockout occurred. Thus, said the Board, even if the lockout was insupportable under *Buffalo Linen*, it was legal under the principles of *American Ship* and *Brown* since this re-sponse to a bargaining impasse did not appear to have been other than economic in nature or inherently to involve hostile or discriminatory motivations against unions as such.

## II

The decision of a lawsuit on a basis different from the one on which it was tried is never very satisfying, and inevitably leaves a sense of unease in a reviewing court. So it is here. In the first place, the Board's decision in effect attributes to the employers a motivation for the lockout other than the one they alleged in their pleadings and sought to prove by their evidence. The employers insisted throughout the hearings that the lockout was ordered solely for the purpose of protecting the integrity of the multi-employer unit in the bargaining negotiations. The Board has, however, now said in substance that, if the employers had known of their rights as they were later to be adumbrated in *American Ship*, they could legally have done the same thing, even without a multi-employer unit, as a response to a bargaining impasse. But, even if they could, no one can say for certain after the fact that they would. There might well have been reasons why some or all of the four employers in question would, absent a purpose to protect a bargaining unit, have delayed or foregone the exercise of an *American Ship* prerogative. To be able to keep on doing business while a competitor is shut down is not a uniformly unhappy condition, as the history of the lumber industry indicates. It could with reason, therefore, be urged that the employers must have their rights in this litigation adjudged by reference to the motivation upon which they *acted* rather than one upon which they *might* have acted.

---

1. Since the issues had been framed with reference to *Buffalo Linen*, the evidence was largely directed towards the questions of whether (1) the employers had bound themselves to accept the bargaining result, and (2) the unions had knowingly consented to bargain on such a basis. The General Counsel vigorously asserted that neither was the case; and the em-ployers insisted just as firmly that each was true. Whether or not these are the precise—and only—indicia of a multi-employer unit in a lockout context, at least it may be said that the relevance of these particular questions to the ultimate conclusion appears to have been fully recognized by the adversaries in the evidentiary hearings.

■ A second difficulty of this same nature is the Board's assumption that an impasse had in fact been reached. Although petitioners represent themselves as prepared to make a similar assumption for purposes of this appeal, they do not concede the fact; and they point to certain circumstances in the record which look the other way. The Examiner made no findings of any kind on this question, which is not surprising since the case was not being tried on an impasse theory. Although the Board is presumably free to make its own findings of fact from its reading of the record, no one would gainsay the desirability of the normal availability to an agency like the Board of findings of fact prepared by one who heard the evidence at first hand. And, of course, there is a serious question of fairness of procedure in relation to a litigant who has assembled and presented his evidence and conducted his cross-examination on a theory unlike the one intruded here for the first time by the Board more than a year after the record closed. It is not enough to say that, since there is evidence in the record supporting the Board's finding, there is no cause for complaint. If a different issue had been tried, the evidence might have been different.

Petitioners have not, however, asked us to invalidate the Board's order for reasons of this character, although they have alluded to some of the problems they present. They ask, rather, that the case be returned to the Board in order that the latter may reexamine its action in the light of considerations not reflected in its decision. They point out that such a remand is peculiarly appropriate at this time because the Board, at the direction of the Supreme Court, is presently taking another look at a case which, although perhaps ultimately distinguishable on its facts, is certainly within the periphery of the general problem. That problem may be broadly defined as the extent to which *American Ship*, which involved a single employer, has application to a multi-employer lockout.

The case in question is Newspaper Drivers & Handlers Local Union, etc., v. Detroit Newspaper Publishers Association, 382 U.S. 374, 86 S.Ct. 543, 15 L.Ed. 2d 423 (1966). When this matter was first before the Board, it decided that one employer—the Detroit *News*—violated the Act (Sections 8(a)(1) and (3)) when it locked out its employees in response to the striking of another paper— the Detroit *Free Press*—in the course of bargaining negotiations which were going on concurrently with both. 145 N.L. R.B. 996 (1964). The two papers were the sole members of the Detroit Newspaper Publishers Association, a voluntary organization which had long existed for the purpose of negotiating and administering labor contracts and handling the labor relations of its members. Although there were, thus, some elements of unity in the two employers' approach to labor relations, the Board did not regard them as constituting a true multi-employer bargaining unit, as evidenced by the Board's finding that it was an unfair labor practice for the *News* to lock out "any of its employees in order to support another employer which is struck by employees represented in a labor organization *with which it does not bargain jointly in a multiemployer unit."* (Emphasis supplied).

The *News* sought relief from the Board's order in the Sixth Circuit. In the interval between Board order and court decision, the Supreme Court decided *American Ship*. The Board thereupon asked the Court of Appeals to remand the case to it for further consideration in the light of *American Ship*. The Court of Appeals denied this request and decided the case on the merits, holding that the Supreme Court's disposition of *American Ship* made it impossible for the Board to hold the Detroit *News* in violation of the Act. 6 Cir., 346 F.2d 527 (1965).

The Board filed a petition for rehearing with the Sixth Circuit. In that petition the Board represented that the Supreme Court in *American Ship* "did not

pass on the question of whether an employer in one bargaining unit may lockout, not directly to advance his own bargaining position, but in support of the bargaining position of an employer in another bargaining unit * * *." It said that *American Ship* had not reached the question presented in *Detroit News*; and that issue was, as it put it, "at the very least an open one." Rehearing was denied; certiorari was sought and granted; and the Supreme Court simultaneously vacated the Sixth Circuit judgments and remanded to the Board for further consideration in the light of *American Ship*.[2] When it took this action the Supreme Court had before it a memorandum submitted by the Board in which it again asserted that, since *American Ship* involved only a single employer, it decided nothing with respect to "the further question whether an employer in one bargaining unit could lockout to advance the position of another employer in a different bargaining unit * * *."

The Board argues to us that there is no occasion in the instant case to remand for consideration in the light of *American Ship* because the Board did just that in the decision under review.[3] It characterizes *Detroit News* as presenting "the question—not present here—whether the lack of impasse and the separate bargaining in a different unit, either singly or in conjunction, are enough to warrant a different result than [sic] that reached in *American Ship* * * *." It is true that there was no finding in *Detroit News* by anyone—Examiner or Board— of a bargaining impasse. But, even if the cases are significantly unlike in this

respect in view of the Board's finding of impasse here, we remain in some doubt as to the other point of distinction pressed by the Board. The Board, omitting the italicized words, points in its brief to the statement by the Court of Appeals in *Detroit News* that "It is conceded that the *Free Press* and the *News* do not bargain with the Teamsters jointly or as a multiemployer unit, *as that term is traditionally used by the Board and the courts.*" (Emphasis supplied). The court's use of "that term" suggests to us that, rightly or wrongly, the Sixth Circuit conceived of an identity between bargaining "jointly or as a multiemployer unit." The Board, contrarily, appears to have believed in the case before us that there can be joint bargaining which falls short of a full-scale multi-employer unit but which still serves to bring a concerted multiple employer lockout within the protection of *American Ship*.

The Board may or may not be right about this, but we think that this position is, at the least, ambiguous in relation to the representations subsequently made by the Board to the Supreme Court in *Detroit News*. Then, as in the Sixth Circuit, the Board employed only the terminology of separate bargaining units when it urged that *American Ship* did not necessarily give an employer in one unit the privilege of supporting by lockout "the bargaining position of an employer in another bargaining unit." Does the Board believe, for example, that joint bargaining in the sense of one representative carrying on the talks for all is the same thing, for purposes of *American*

---

**2.** The failure of the Supreme Court in this connection to refer to its *Brown* decision confirms us in our belief that that case has little, if anything, to do with the problem. The question in *Brown* was whether the employer-members of a multiemployer bargaining unit could not only lock out their employees, as contemplated in *Buffalo Linen*, but also hire non-union replacements during the lockout. The Supreme Court's holding in *Brown* that they could suggests that *Buffalo Linen* has great and continued vitality, but it illumines very faintly, if at all, the impli-

cations of *American Ship* for multiple employer lockouts, at least in those cases where the Board has not found the employers to have formed a multi-employer bargaining unit of the kind involved in *Brown* and *Buffalo Linen*.

**3.** The Board's decision and order under review were issued November 16, 1965— three months before the Supreme Court acted to remand to it the *Detroit News* case. Thus, although the Board acted here in the light of *American Ship*, it did not then know what disposition the Court would make of *Detroit News*.

*Ship,* as joint bargaining in the sense of commitment by all to be bound by the deal which the representative makes? And does it make any difference, again for the reach of *American Ship,* whether the union has or has not known of, or agreed to, the terms *inter sese* upon which several employers have undertaken to bargain jointly? Are there perhaps other indicia which are relevant to what the Board had in mind when it spoke to the courts in *Detroit News* of separate bargaining units in a situation where there were present certainly some aspects of jointness?

The Board suggests to us that the concept of a multi-employer bargaining unit is neither so definite nor so easily identifiable as petitioners would have us believe. We have earlier noted that:

"* * * Group activity in the collective bargaining field has no statutory matrix by which the contours of the resulting rights and obligations can be deductively defined. It is clear that group activity can and does range over a wide spectrum of habits, practices, and understandings, explicit and implicit, which makes generalization more hazardous than usual."

Retail Clerks Union No. 1550 v. NLRB (Kroger Company), 117 U.S.App.D.C. 336, 342, 330 F.2d 210, 216, cert. denied, 379 U.S. 828, 85 S.Ct. 41, 13 L.Ed.2d 31 (1964). We there applauded the Board's practice, in matters involving group activity, of "wisely looking to the facts of the particular case in deciding whether a complaint about reprehensible conduct is justified. * * *" What gives us difficulty here is that the Board has seemed to think that, at any rate for the purpose of distinguishing *Detroit News,* the precise facts are of no controlling significance so long as there was some kind of activity which could be characterized as joint. "Joint" is, however, a word of generalization. It does not reveal the exact nature of the employers' arrange-

ment about bargaining, nor does it clearly tell us why, in the Board's view, the joint aspects of the conduct of labor relations by the Detroit newspapers failed to land them in the same bargaining unit for lockout purposes while the measures of cooperation here employed brought the lumber companies within the shelter of *American Ship.*

The Board's opinion says only that, at the least, the employers' association here "served as the designated bargaining representative through which its six members bargained jointly with the Unions during those negotiations"; and that "all six Employers had reached an impasse * * *." Thus, the lockout may be viewed as "economic action taken to further their own bargaining position * * *." It is not clear whether, in this context, "their" is used by the Board in the sense of "each." In any event, the Board's characterizations are ambiguous.[4] If the Board's theory is that this was in fact a case where a common agent was bargaining separately for six employers, and that each such employer may be considered as exactly like the single employer involved in *American Ship,* this is not only not clear from the decision but also would appear to merit more analysis by way of justification than the Board has vouchsafed us, particularly when the competitor-employers have said on the record that they locked out simultaneously in support of each other. If, on the other hand, the Board is thinking of the "joint bargaining" here as welding the six in legal contemplation into a single employer within the meaning of *American Ship,* then it is hard to see at this distance how the Board can avoid dealing with the Examiner's findings as to the existence of a multi-employer bargaining unit. There are both legal and policy questions implicit in these alternatives which demand expert judgment of the Board as well as full explication by it.

4. This is not helped by later references in the decision to the lockout as being "in furtherance of the bargaining position advanced jointly for all six Employers by the Association"; and to this case as involving a situation where "two or more employers bargain jointly with a union * * *."

We do not purport to know the answers to the questions suggested above, but only that they are important. They are paradigms of the kinds of matters which should be explored and decided in the first instance by the Board, on hearing records made with reference to them and on findings which give some assurance that a resulting interpretation of the statute is neither remote nor misty in relation to its factual coordinates. We think that the cause of an ultimately rational disposition of the problems involved in multiple employer lockouts will best be served by remanding this case to the Board for further proceedings.

It is so ordered.