**WESTERN STATES REGIONAL COUNCIL NO. 3, INTERNATIONAL WOODWORKERS OF AMERICA, AFL–CIO, and Western Council of Lumber and Sawmill Workers, AFL–CIO, Petitioners,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent,**

**Weyerhaeuser Company, Crown Zellerbach Corporation, Rayonier Incorporated, and International Paper Company and Association, Intervenors.**

No. 21317.

United States Court of Appeals District of Columbia Circuit.

Argued April 25, 1968.

Decided June 19, 1968.

Mr. Joseph L. Rauh, Jr., Washington, D. C., with whom Messrs. John Silard and George Kaufmann and Mrs. Harriett R. Taylor, Washington, D. C., were on the brief, for petitioners.

Mr. Glen M. Bendixsen, Atty., N.L.R.B., with whom Messrs. Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, and Marcel Mallet-Prevost, Asst. Gen. Counsel, N.L.R.B., were on the brief, for respondent.

Mr. Charles F. Prael, San Francisco, Cal., with whom Mr. Guy Farmer, Washington, D. C., was on the brief, for intervenors.

Before BAZELON, Chief Judge, and WRIGHT and McGOWAN, Circuit Judges.

J. SKELLY WRIGHT, Circuit Judge:

Once again we are asked to review an order of the National Labor Relations Board absolving the four lumber companies, intervenors here, from a violation of Section 8(a) (1) and (3) of the National Labor Relations Act, 29 U.S.C. § 158(a) (1) and (3) (1964 ed.). Our first contact with this case left us with some doubt as to the validity of the theory upon which the Board was proceeding and consequently we remanded the case to the Board for further consideration. Western States Reg. Council No. 3, Int. Woodworkers v. N. L. R. B., 125 U.S.App.D.C. 1, 365 F.2d 934 (1966). On June 29, 1967, the Board issued the supplemental decision and order presently under review. In view of the Board's findings and conclusions therein, the unions' petition is denied.

I

Prior to 1962 labor contract negotiations in the lumber industry had in large part been conducted by single employers or informal groups of employers none of the members of which had been fully bound to accept the results of any negotiations. However, in preparation for the negotiations for the 1963 contract, six timber and lumber processing com-

panies in the Pacific Northwest, led by the Weyerhaeuser Company, decided to form an association to bargain collectively with the unions representing their employees to a settlement binding on all parties. An agreement establishing the association was signed by April 22, negotiations commencing with the International Woodworkers of America on April 24 and with the Lumber and Sawmill Workers on May 9. Bargaining sessions, attended by representatives of the unions and the association's negotiating committee, were held throughout May and into June.[1] On June 5 the unions called a strike against two of the companies, St. Regis Paper Company and U. S. Plywood Company, and, on June 7, the remaining association members locked out their employees pursuant to the provision of the association agreement that the others would cease operating if any member of the association were struck.[2]

Asserting the unlawfulness of the concerted lockout, the unions filed unfair labor practice charges with the Board in mid-June of 1963. Hearings were held before a trial examiner during April and May, 1964. The issues for these hearings had been framed with an eye to the Supreme Court's decision in N. L. R. B. v. Truck Drivers Local Union No. 449 etc. (*Buffalo Linen*), 353 U.S. 87, 77 S.Ct. 643, 1 L.Ed.2d 676 (1957), and accordingly the evidence was directed to the questions whether (1) the employers as a group had bound themselves to accept the bargaining result and (2) the unions had knowingly consented to bargain on such a basis. The trial examiner decided both questions favorably for the employers and, applying *Buffalo Linen*, ruled that the employers' conduct in locking out their employees was not in violation of the Act. This recommendation of the trial examiner was issued on April 5, 1965.

Seven months later the Board issued its opinion and order. Although it agreed with the trial examiner that the employers' actions were not unlawful, it did not pursue the same path the examiner had. Rather, the Board referred to the Supreme Court's holding in American Ship Building Co. v. N. L. R. B., 380 U.S. 300, 85 S.Ct. 955, 13 L.Ed.2d 855 (1965), handed down one week before the trial examiner's recommendation was issued, that where the parties have bargained to an impasse, an employer may lock out his employees to advance his bargaining position, absent independent evidence of an unlawful motivation. Since that holding could be applied in the instant case, the Board reasoned, there was no need "to pass on the Trial Examiner's factual conclusions that the Association existed, functioned, and was accepted by the Unions as a formal multiemployer bargaining unit." The Board therefore merely looked to the state of the negotiations prior to the lockout and to the apparent motivation for such a closing down of operations. Concluding that an impasse had been reached and that there was no hostile or discriminatory motivation prompting the employers to lock out, the Board dismissed the unions' complaint. The unions appealed to this court.

Our review of the Board's order was hampered by our concern that cases not be decided on grounds other than those on which they are tried and, more important, by our uncertainty of the applicability of *American Ship*, a single employer situation, to the present case, a multi-employer bargaining group. We

1. The majority of existing contracts had a terminal date of June 1, 1963.

2. Paragraph (7) of the association agreement provides:
"If as a result of negotiations on or with respect to subjects of bargaining delegated to the association, a strike is instituted by the union involved against any one or more of the association members or against any one or more of the operations listed in Exhibit 'A', all other member companies of the association committed to such negotiations shall thereupon close the operations listed in Exhibit 'A' in which the striking union is involved, in order to protect the entire membership of the association in its conduct of such bargaining negotiations. * * *"

therefore remanded the case to the Board which, after affording all parties an opportunity to file additional briefs, issued the supplemental decision and order presently under review. In that supplemental decision and order, the Board reaffirmed its *American Ship* rationale, but only after it expressly adopted the trial examiner's finding that the employers' actions were permissible under *Buffalo Linen*. Since we find the *Buffalo Linen* analysis is dispositive of the unions' complaint and is supported by substantial evidence in the record, we find no need to reconsider or restate our position with respect to the applicability of *American Ship* to this case.

## II

■ In addressing itself to the theory on which the trial examiner had heard and decided the case, that is, *Buffalo Linen*, the Board stated that the test to be applied in determining the status of a multi-employer unit is "whether the members of the group have indicated from the outset an unequivocal intention to be bound in collective bargaining by group rather than individual action, and whether the union representing their employees has been notified of the formation of the group and the delegation of bargaining authority to it, and has assented and entered upon negotiations with the group's representative." *See* Van Eerden Company, 154 NLRB 496, 499 (1965); The Kroger Company, 148 NLRB 569, 573 (1964). We approve the use of that test. Indeed, the unions do not assert that it is an improper statement of the *Buffalo Linen* doctrine, but rather limit themselves to a challenge of the Board's underlying factual findings.

■ Where, as here, the question presented is not one of law but of the reasonableness of the Board's findings and conclusions, our function on review is simply to ascertain whether, considering the record as a whole, there is substantial evidence to support the Board's determinations. Section 10(f), National Labor Relations Act, 29 U.S.C. § 160(f) (1964 ed.); Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951); Int. U., United Automobile, etc. Workers v. N. L. R. B., 129 U.S.App.D.C. 196, 392 F.2d 801 (1967), *cert. denied, sub nom.* Preston Products Co. v. N. L. R. B., 392 U.S. 906, 88 S.Ct. 2058, 20 L.Ed.2d 1364 (1968). A review of this record convinces us of the reasonableness of the Board's findings that the six companies comprising the association had effectively established a multi-employer bargaining unit within the meaning of prior Board precedents and that both unions had accepted that unit in the course of bargaining.

With respect to the first aspect of the standard, that is, whether the employers intended to bind themselves by the results of the association's bargaining efforts, there is ample evidence that the employers so intended. Thus it is clear that the prime motivation for forming the association was to seek common contract terms with the unions and that this intent was unequivocally embodied in the agreement establishing the association, Paragraph (3) of which states: "Subject matters which the Companies agree to submit to association bargaining will be all matters pertaining to the wages, hours and other conditions of employment of the employees hereinabove mentioned * * *." And Paragraph (6) provides: "Whenever negotiations between the association and authorized bargaining representatives of local unions pertaining to subjects of bargaining delegated to the association and to such union representatives, result in an agreement, subject to ratification by the union membership involved, all of the collective bargaining agreements between the several association members and the affected local unions shall be amended and supplemented accordingly."

Moreover, prior to the negotiations each member company sent a standard letter to both unions specifically stating that it had delegated to the association the authority to bargain collectively with respect to all matters other than certain specified subjects customarily reserved

for local negotiations,[3] and Wyatt, the spokesman for the association, explained to both unions at the first bargaining sessions that any settlement reached would be binding on all members of the association. These comments cannot be dismissed as simply self-serving statements since it is clear that two prospective members of the association, Simpson Timber Company and Scott Paper Company, withdrew because they were unwilling to make a commitment to be so bound.

The unions do not contest any of the above but do point to other evidence which they assert negates the binding quality of the association.[4] But the Board considered each of these items in its supplemental decision and order and resolved whatever conflicting evidence there was in favor of the employers. We cannot say that in so doing the Board acted arbitrarily, capriciously, or without substantial support in the record. Thus, for example, where the unions point to the fact that a provision stipulating association power "binding on all companies" was deleted from the final draft of the association agreement and at the same time the word "voluntary" was added, the Board's not unreasonable response is that "[i]n context, the use of 'voluntary' is most reasonably interpreted as a descriptive term referring to the status of the Association, like that of any multi-employer association, as one founded on 'consensual relationship' among its members." And when the unions insist that the binding quality of the association is impaired by the provision in the agreement that issues were to be resolved by a 75 per cent vote,[5] the Board answers that the practical effect of this rule was that, in order to "veto" a proposal, at least *two*

---

3. The letters read in pertinent part as follows:

> "This is to advise you that the undersigned Company is a member of a voluntary multi-employer Association, herein called the 'Association' comprised of the following named employer Companies in the wood products industry:
>
> \*    \*    \*    \*    \*
>
> "We hereby notify you that this Company hereby delegates to the Association authority to bargain collectively on and with respect to any revisions of the existing agreements between your Union and this Company at its operation named on the attached list, pertaining to all matters which involve the wages, hours or other conditions of employment of employees of this Company represented by your Union at such locations, other than the subjects of (1) pensions, (2) union security, (3) health and welfare, and (4) those issues which have been customarily subject to local negotiations.
>
> \*    \*    \*    \*    \*
>
> "The Association and this Company will be prepared to meet with you for the purposes indicated at mutually convenient times and places. \* \* \*"

The exclusion of pensions, union security, health and welfare, and issues customarily reserved for local negotiations is not inconsistent with the establishment of a multi-employer bargaining unit. N.L.R.B. v. Sun-Jee Corporation, 2

Cir., 385 F.2d 379, 383 (1967); Retail Clerks Union, No. 1550 v. N.L.R.B., 117 U.S.App.D.C. 336, 342, 330 F.2d 210, 216, *cert. denied*, 379 U.S. 828, 85 S.Ct. 59, 13 L.Ed.2d 39 (1964); The Kroger Company, 148 NLRB 569, 573 and n. 6 (1964).

4. Thus the unions argue that several changes were made in the association agreement during the drafting process which minimized the binding quality of that agreement; that the letters from each of the companies stated that "[t]he Association *and this Company* will be prepared to meet with you \* \* \*" (emphasis added); and that U.S. Plywood continued to insist on individual bargaining over hours of work and overtime and threatened to withdraw from the association if it were precluded from such individual bargaining.

5. Paragraph (5) provides:

> "After written notice is given by the association to the appropriate union as to matters upon which the association is authorized to negotiate, the Companies shall bargain collectively as a multi-employer association and each member company shall participate in such negotiations. Whenever any decision must be reached pertaining to such bargaining negotiations, a favorable vote of 75% of the association membership shall be required. Each member company shall have one vote."

of the six companies' negative votes were required.[6] Admittedly in *Buffalo Linen* itself the multi-employer unit operated on a majority rule, but the difference in percentages does not here dictate a different result.

Another, and perhaps more significant, difference between this case and *Buffalo Linen* is that, while in the latter the union had been bargaining with the multi-employer unit as such for 13 years, the history in the lumber industry has been bargaining by single employers or informal, not fully bound, groups. Although obviously past actions may be indicative of present intent, in view of the other credible evidence in the record, and given the fact that the Board and the trial examiner are of one mind, we cannot say that the conclusion that the employers intended to be bound in 1963 is unfounded.

The second aspect of the test to determine the status of a multi-employer unit, that is, whether the unions had knowingly consented to bargain on the basis of a multi-employer unit, is more troublesome. The Board rests ultimately on the fact that the unions responded favorably to the informal employer feelers concerning the proposed association, were subsequently formally notified of the companies' agreement to be bound, and thereafter, with this knowledge, entered into negotiations with the association's negotiating committee, submitting their proposals to the association as such and responding to its offers as group offers. The unions contend, however, that the history of bargaining in the industry and

the information they received led them to believe that the association was no different from any of the previous loose employer associations lacking fully-bound attributes, and that consequently they could not be deemed to have consented to a multi-employer bargaining unit. Moreover, the unions vigorously assert that they were unaware of the 75 per cent rule and that, absent full disclosure of the association's agreement, any implied consent to bargain with that association is vitiated.

We believe that there is substantial evidence in the record to support the Board's finding that the unions assented to the formation of a multi-employer bargaining unit and entered into negotiations with the group's representatives. It is clear that the employers would have had a stronger case if they had made a copy of the agreement, including the 75 per cent rule and any other relevant terms, available to the unions. But from all of the evidence in the record we cannot conclude that the unions were uninformed of the fully-bound quality of the association, or that their decision to enter into negotiations with the multi-employer unit would have been changed had they known specifically of the 75 per cent rule. Moreover, the basis for the unions' assumptions that the association operated on a majority rule is somewhat dubious since multi-employer bargaining units with voting requirements of substantially more than 51 per cent are not uncommon.[7] Finally, it is not insignificant in this case that after the strike, lockout, unfair labor practice charges and re-

6. Indeed, the record shows that on two separate crucial issues Weyerhaeuser Company, the largest and most influential of the six member companies, was outvoted by the other association members and was bound by the group decision. Moreover, the association agreement states that "[a]dditional employer companies may become members of this association by (i) making application therefor, (ii) being accepted by the unanimous vote of the members of this association at the time such application is received, and (iii) signing an agree-

ment to be bound in the same manner as all other Companies signatory to this agreement." Presumably the 75% rule will not be changed so that if additional members do join the association even more negative votes will be required to "veto" a proposal.

7. There is some evidence that when the Lumber and Sawmill Workers first began negotiating with the association it assumed that unanimous consent was required and that even one negative vote could block acceptance of a proposal.

sumed negotiations, the unions did sign a contract with the association *qua* association.

### III

Thus we find in the record, considered as a whole, substantial credible evidence to support the Board's findings that the six employers comprising the association had established a formal multi-employer bargaining unit and that the unions, in the course of bargaining, had accepted that unit. From these findings it is logical to conclude, as the Board did, that the lockout following the unions' strike against the other two members of the unit was a lawful defensive act, sanctioned by the Supreme Court in *Buffalo Linen*,[8] and that the unions' unfair labor practice complaint should be dismissed. Accordingly, the unions' petition in this court to review the Board's order is

Denied.

8. Indeed, the unions do not dispute that the employers' announced reason for the lockout was "to protect the interests of our group against this selective strike * * *," an expression which conjures up *Buffalo Linen* in its entirety.