INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, LOCAL UNION NO. 68, AFL–CIO, Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

No. 23634.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 11, 1970.

Decided June 22, 1971.

As Amended July 28, 1971.

Petition for Rehearing Denied Sept. 15, 1971.

Leventhal, Circuit Judge, filed a dissenting opinion.

MacKinnon, Circuit Judge, filed statement as to why he voted against rehearing.

Mr. Philip Hornbein, Jr., Denver, Colo., with whom Mr. Laurence J. Cohen, Washington, D. C., was on the brief, for petitioner.

Mr. Frank Vogl, of the bar of the Supreme Court of Iowa, pro hac vice, by special leave of Court, with whom Messrs. Arnold Ordman, General Counsel, Dominick L. Manoli, Associate General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, and Elliott Moore, Atty., National Labor Relations Board, were on the brief, for respondent.

Before TAMM, LEVENTHAL and MacKINNON, Circuit Judges.

MacKINNON, Circuit Judge:

The petitioner, International Brotherhood of Electrical Workers, Local No. 68 (the Union), instituted proceedings in the present case by filing with the National Labor Relations Board (the Board) an

unfair labor practice charge against the J–H Electric Company. The General Counsel of the Board issued a complaint in response to the Union's charge, and a full hearing was had before a trial examiner. The gravamen of the charge filed by the Union, and of the complaint issued by the General Counsel, was (1) that J–H Electric's employees were part of a multi-employer bargaining unit[1]; (2) that a valid collective bargaining agreement had been negotiated between the Union and the Rocky Mountain Chapter of the National Electrical Contractors Association (NECA) (acting as the representative of the various employers allegedly included within the multi-employer association); (3) that J–H Electric, as an employer-member of the multi-employer association, was bound by the terms of the collective bargaining agreement thus negotiated; and (4) that J–H

Electric has refused to be bound by and has refused to carry out the terms of the collective bargaining agreement. The refusal to abide by the agreement allegedly placed J–H Electric in violation of sections 8(a) (1) and 8(a) (5) of the National Labor Relations Act.[2]

The dispute in this case arises within the context of multi-employer bargaining, a collective bargaining practice which has developed without the benefit of explicit statutory recognition, and thus without the sort of detailed legislative guidance that exists as to the majority of labor relations problems.[3] As a consequence, the subject of multi-employer bargaining is one comparatively unstructured by well-defined and fixed principles, and the peculiar facts of each case therefore assume increased significance.[4] As will be seen, this is especially true in the present case.[5]

1. The term "multi-employer unit" is usually understood to refer to the unit of *employees*, and will be used in that sense throughout this opinion. The term "multi-employer association" will be used to refer to the group of *employers* engaged in multi-employer bargaining.

2. 49 Stat. 453, as amended, 29 U.S.C. §§ 151 *et seq.* (1964). Sections 8(a) (1) and 8(a) (5), 29 U.S.C. §§ 158(a) (1) & (5) (1964) provide as follows:

 "(a) It shall be an unfair labor practice for an employer—

 (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;

 \* \* \* \* \*

 (5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title."

3. Section 9(b) of the National Labor Relations Act, 29 U.S.C. § 159(b) (1964) confers on the Board the duty to determine in each instance whether "the unit appropriate for the purposes of collective bargaining shall be the employer unit, craft unit, plant unit, or subdivision thereof \* \* \*." The Board, however, has from an early date construed the term "employer unit" to comprehend multi-employer units, and this practice was well known to Congress when it enacted the Taft-Hartley Act. Although

differing proposals dealing with multi-employer bargaining were considered by both Houses of Congress in the course of enacting the Taft-Hartley Act, the bill finally reported from the conference committee contained no reference to the subject. Despite the absence of explicit statutory recognition, the Board's construction of "employer unit" to include multi-employer units was given formal approval by the Supreme Court in the *Buffalo Linen* case, N.L.R.B. v. Truck Drivers Local 449, 353 U.S. 87, 77 S.Ct. 643, 1 L.Ed.2d 676 (1957). In *Buffalo Linen*, the Court stated that Congress "intended to leave to the Board's specialized judgment the inevitable questions concerning multi-employer bargaining bound to arise in the future." 353 U.S. at 96, 77 S.Ct. at 647. *See generally* Comment, Withdrawal from Multi-Employer Bargaining—Reconsidering *Retail Associates*, 115 U.Pa.L.Rev. 464 (1967); Comment, The Status of Multiemployer Bargaining Under the National Labor Relations Act, 1967 Duke L.J. 558, 562–564.

4. *See* Retail Clerks Union, No. 1550 v. N.L.R.B., 117 U.S.App.D.C. 336, 338, 330 F.2d 210, 212, cert. denied, 379 U.S. 828, 85 S.Ct. 41, 13 L.Ed.2d 31 (1964).

5. The facts as set forth, except as otherwise indicated, are taken from the extensive findings of fact made by the trial examiner and adopted by the Board.

## I. Bargaining History Prior to 1965

Beginning around 1957 and continuing to the present, the Union has served as the collective bargaining representative of certain employees of electrical contractors doing business in the northeastern section of the state of Colorado. The geographical jurisdiction of the Union generally covers 21 counties in and around Denver, Colorado. Although the trial examiner made no specific finding to the effect, the record indicates that 19 of these counties for some purposes may be considered part of the greater metropolitan area of Denver. They have substantial areas that are comparatively urbanized, while the remaining two counties, Weld and Larimer,[6] though they have some portions which are fairly near Denver are comparatively rural in character. J–H Electric has its office and principal place of business in Greeley, Colorado. This is the largest city in Weld County and we note from the map that it is about 42 miles from Denver.

Throughout the time that J–H Electric has been in business, NECA has acted as the collective bargaining representative for the unionized electrical contractors in the 21-county area, although not all of those contractors are or have been actual members of NECA. Since 1958 Mr. John W. Hecht has been the executive manager of NECA and has "assisted" in all negotiations between the Union and the electrical contractors in the 21-county area. Prior to 1965, separate contracts were negotiated with the Union, in separate negotiations, covering: (1) the 19 counties in the Denver metropolitan area (referred to hereafter as the Denver contract[7]); (2) Larimer County; and (3) Weld County. Although all negotiations were carried on with the "assistance" of NECA, contractor representatives through the mechanism of "bargaining committees" also frequently took an active part in the actual negotiations, a practice frequently followed by Weld contractors whenever a Weld County contract was being negotiated.

Prior to 1965, although the agreements covering the three geographical areas were separately negotiated and were incorporated in physically separate contracts, many of the provisions of the separate contracts were in fact identical. However, they differed in health benefit provisions, in the definition of the Normal Construction Labor Market for Davis-Bacon Act[8] purposes, sometimes in contract anniversary dates, and in the applicable wage scales. The difference in wage scales, the most significant difference in relation to the problem posed in this case, was simply that the wages negotiated for the more rural in character Weld and Larimer Counties were somewhat lower than the wages negotiated for the more urban 19 counties in the Denver metropolitan area. The last Denver contract negotiated prior to 1965 was to have an anniversary date of April 1, 1965, and the last Weld County contract negotiated prior to 1965 was to have an anniversary date of October 1, 1965.

## II. The 1965 Negotiations

There is little information in the record, and the trial examiner did not make findings, as to negotiations in 1965 between the Denver area contractors and the Union, but the record does contain a copy of the Denver contract that resulted.

6. Larimer County when referred to in the record is sometimes incorrectly spelled as "Laramer" or "Laramie." Its principal city Fort Collins, is about 53 miles from Denver. We also note that the counties of Indian, Grand, Summit, Eagle and Lake are separated from Denver by many miles and many mountains, including in some instances the Continental Divide.

7. This agreement is sometimes referred to in the record as the "Area Agreement" or the "Base Agreement."

8. 46 Stat. 1494, as amended, 40 U.S.C. §§ 276a to 276a–5 (1964). Under the Davis-Bacon Act, the Normal Construction Labor Market is used by the Secretary of Labor to determine the minimum wage rate that can be paid to laborers and mechanics employed by contractors or subcontractors on federal contracts of more than $2000 for the construction, alteration, or repair of public buildings or works.

Presumably, because of the earlier expiration date of the last Denver contract negotiated prior to 1965, the Denver negotiations took place previous to any negotiations between the Union and Weld contractors. Certainly the Denver negotiations were concluded sometime before April 1, 1965, the anniversary date of the prior contract. However, even though the Weld contract was not due to expire until October 1, 1965 the record does show that Weld County negotiations of at least an informal sort were taking place perhaps even sometime before March of 1965, if not actually between the Union and Weld contractors at least between NECA, on behalf of the Weld contractors, and Union representatives.

Toward the end of March of 1965, NECA sent a "Negotiations Bulletin" to the Weld contractors urging them to ratify a number of proposed amendments to the existing contract by signing the appropriate enclosed documents. Apparently the proposed amendments had been negotiated between NECA representative Hecht and representatives of the Union,[9] and included were the following:

A. Provided the following amendments are mutually agreed to by both parties, the Weld County Agreement as it now exists shall be cancelled and made null and void after April 1, 1965.

B. The Rocky Mountain Chapter [NECA] will appoint a resident contractor of Weld County to act as advisor to the Area Negotiating Committee.[10]

The proposals contemplated generally that the agreement between the Weld County contractors and the Union would be incorporated into the Denver contract, and a number of the proposed amendments dealt with the details of accomplishing this purpose. However, a separate wage schedule applying only to Weld County was also to be incorporated, along with other specific exceptions. This chain of events was terminated, however, when the Union membership on March 30, 1965, voted against ratification of the proposed amendments.[11]

The Union officially reopened negotiations for a new agreement by a letter to NECA on May 17, 1965, noting the changes desired by the Union in the current agreement.[12] NECA responded

---

9. The trial examiner made no specific findings on this point, but the record discloses that negotiations leading up to tentative agreement did not always follow the same pattern. Although negotiations normally took place in the form of bargaining sessions between Union representatives and contractor representatives, with NECA official Hecht present and assisting the contractors, it appears that at times Hecht alone met informally with Union representatives to discuss proposals. This latter procedure seems to have been the one which led to the proposed amendments referred to in the text above.

10. Trial Examiner's Decision, 178 N.L.R.B. No. 108, p. 4 (1969), Appendix of the Parties (cited hereafter as "App.") p. 5. The Denver contract at all times provided for a "Negotiations Committee," although the precise authority, duties and responsibilities of the committee were never spelled out in great detail in the agreement. *E. g.,* General Counsel's Exhibit No. 11 p. 6, App. p. 297A–6:

"1.07 Joint negotiations and/or conference committee: Each of the organizations signatory hereto shall appoint (5) of its members to serve as regular members on the Joint Negotiations and/or Conference Committee. In addition, each organization shall appoint one of its members as an alternate. The manager from each organization shall serve as advisor to the Negotiating and/or Conference Committee. This committee is to meet at least once each calendar month or within 48 hours' notice of either party."

11. NECA notified the Weld contractors of this action by letter on April 1, 1965. J-H Electric, despite this notification, nevertheless indicated its acceptance of the proposals as requested by the earlier "Negotiations Bulletin" from NECA. The record does not indicate, however, that this fact ever came to the Union's attention.

12. All of the collective bargaining agreements with the Union over the years provided for a mechanism for opening negotiations for changes in an existing agreement. Generally, the provisions of an

with a letter to the "Weld County Division" of the Union [13] on May 28, 1965 which similarly served as formal notice of a desire to reopen negotiations for a new agreement and similarly listed the contract changes proposed by NECA, as the representative of "contractors of Weld County signatory to the agreement of reference." [14] The first bargaining session between Union representatives and Weld contractor representatives took place on June 16, 1965. At that meeting the contractors reiterated their desire to have the Weld County agreement incorporated within the Denver contract—but with certain exceptions. This desire was prompted, according to the contractors, by the fact that under the currently existing agreements, whenever a Weld contractor undertook a job outside of Weld County but within the area covered by the Denver contract, in effect he could bring along only one of his Weld County employees. It was necessary to hire, through the Union hiring hall, union labor subject to the Denver contract to man that particular job.[15] Since the change proposed by the Weld contractors would, as to this aspect of the situation, result in expanded work opportunities for those members of the Union who resided in Weld County, the contractors indicated that they could not understand why the members of the Weld County Division of the Union had rejected that proposal.[16] Union representatives indicated that they would take the matter up further with their membership, along with the other specific proposals advanced by the Weld contractors.

The next meeting between Union representatives and Weld contractor representatives took place on July 7, 1965. At that time, the Union representatives indicated that the Union was willing to go along with the contractor proposals put forth at the last meeting, but the contractors, in what the Union representatives regarded as a total reversal of position, now balked at this, and presented a new package of proposals which did not include incorporating Weld County within the Denver contract. J–H Electric's representatives specifically expressed the position at that time that "they felt Weld County problems could be handled by Weld County people." [17] The minutes of the meeting end on this note of impasse. Subsequently, the Weld County contractors held a meeting amongst themselves on July 23, 1965 and there it was decided to accept the substance of the proposals previously advanced by the Weld contractors at the June 16th negotiating session and agreed to by the Union at the July 7th negotiating session. The contractors, however, did decide to hold out for a lower wage schedule than had been incorporated in the previous proposals. This new position, or rather return in substance to a former position, was communicated by NECA to the Union by letter on July 27, 1965. Apparently the Union then agreed to accept all the contractors' proposals except the proposal as to wages, without any further face-to-

existing agreement were to automatically continue in effect from year to year beyond the anniversary date of the agreement, unless a formal "Letter of Notice" was sent by the party desiring a change to the other party at least 120 days prior to the anniversary date of the contract. Negotiations then were to proceed only on those proposals for changes set forth in the Letter of Notice. See, e. g., General Counsel's Exhibit No. 8 p. 2, §§ 1.03 & 1.06, App. p. 316.

13. Prior to 1965 the "Weld County Division of Local Union No. 68, IBEW" was the formal Union party to the contract with the Weld County contractors.

14. Respondent's Exhibit No. 4 p. 2, App. p. 386.

15. E. g., General Counsel's Exhibit No. 8 p. 14, § 7.03, App. p. 321; General Counsel's Exhibit No. 9 pp. 10–11, § 3.15, App. pp. 308–309.

16. The reason behind the Union membership's rejection of the initial proposals may be related to a dissatisfaction concerning the lack of a proposal for provision of health benefits. See the transcript of the hearings before the trial examiner, App. p. 123.

17. Respondent's Exhibit No. 2 p. 2, App. p. 392.

face negotiations with the Weld contractor representatives. The unresolved issue as to wages was submitted to the Council of Industrial Relations for settlement,[18] and on August 20, 1965 the Council issued its decision fixing the wage schedule.

On September 15, 1965 the Union and NECA signed two agreements: (1) a "Cancellation Agreement"[19] and (2) an "Agreement Covering Weld County, Colorado."[20] The first constituted the agreement of the parties to declare the existing agreement null and void and replace it with the Denver agreement; and the second dealt with the details of making the transition, and with the exceptions specifically applicable to Weld County which were to be incorporated into the Denver contract. Thus, the outcome of all the ups and downs of the 1965 Weld County negotiations was, except for minor details, to: (1) include Weld County within the basic coverage of the Denver contract, with a uniform contract anniversary date; (2) bring Weld County within the Normal Construction Labor Market; and (3) incorporate specific exceptions for Weld County, primarily an exclusion from health benefit requirements and provision for a lower wage scale.

The Weld contractors apparently thereafter complied with the terms and conditions of the agreement as thus constituted, but there followed two events of particular significance to the present controversy. On March 2, 1966 one of the partners of J–H Electric signed and transmitted to the Union a "Letter of Assent," which read as follows:

This is to certify that the undersigned firm has examined a copy of the labor Agreement between the Rocky Mountain Chapter, NECA, Inc., and Local Union No. 68, IBEW, dated and effective the 1st day of April, 1965.

The undersigned firm hereby agrees to comply with all the terms and conditions of employment contained in the aforementioned Agreement and all approved amendments thereto. It is further agreed that the signing of this Letter of Assent shall be as binding on the undersigned firm as though it had signed the above referred to Agreement and any approved amendments thereto.

In signing the Letter of Assent the undersigned firm does hereby authorize the Rocky Mountain Chapter, NECA as its collective bargaining representative for all matters contained in this Agreement or pertaining to this Agreement. This authorization to the Rocky Mountain Chapter, NECA, shall remain in effect until terminated by written notice to the parties to the aforementioned Agreement 30 days prior to the notification date provided for therein.[21]

The second happening of significance occurred on March 17, 1966 when J–H Electric, at the request of NECA, executed and transmitted to NECA a "Bargaining Authorization Agreement," which read as follows:

IT IS HEREBY AGREED between the undersigned firm engaged in the

---

18. The Council, composed of an equal number of management and labor representatives, sits on the national level to settle disputes between locals of the Union and chapters of NECA. *See* the transcript of the hearings before the trial examiner, App. p. 129. The various collective bargaining agreements in existence over the years all required that any matter opened for negotiation by a Letter of Notice, *see* note 12, *supra* and not settled by agreement within a specified time prior to the contract termination date, be submitted to the Council for settlement. *E. g.*, General Counsel's Exhibit No. 11 pp. 5–6, § 1.06, App. pp. 297A–5 to 6.

19. General Counsel's Exhibit No. 17, App. p. 264.

20. General Counsel's Exhibit No. 16, App. p. 265.

21. General Counsel's Exhibit No. 3, App. p. 329.

business of electrical contracting and the Rocky Mountain Chapter, National Electrical Contractors Association, hereinafter referred to as the "Association."

That the undersigned firm does hereby authorize and appoint the Association to act as bargaining agent and representative in matters of labor negotiations and labor relations, and authorize said Association to negotiate agreements and amendments to agreement [sic] on behalf of this firm with Local Union No. 68 of the International Brotherhood of Electrical Workers; and the Association agrees to act as bargaining agent and representative and to use its best efforts to secure the most reasonable terms obtainable on behalf of the undersigned firm and other firms represented by the Association. This authorization and agreement shall continue in effect from year to year unless and until terminated by either the undersigned firm or the Association upon sixty (60) days' written notice, *provided* that this agreement is coupled with an interest and is irrevocable by either party and may be terminated only on consent of both parties during the period between December 1st of any year and April 1 of the year immediately following.[22]

### III. *The 1966–1967 Negotiations*

On November 29, 1966 the Union by letter notified NECA of its desire to negotiate changes in the existing Denver contract, which by now covered Weld County also.[23] The Union's Letter of Notice made no specific reference to those sections of the Denver contract which dealt with the wage scale applicable to Weld and Larimer Counties (sections 6.18 L & W). NECA sent a similar Letter of Notice to the Union on December 1, 1966, but its Letter did contain proposals for changes in the Weld and Larimer wage provisions specifically.

The first bargaining session was held on December 15, 1966 between contractor representatives and Union representatives.[24] The contractor representatives present were all from the 19-county area, but John Hecht of NECA was present "representing" all contractors subject to the Denver contract. The minutes of the meeting show that following a contractor caucus the Union representatives were told that "[i]t is understood that Sections 6.18, L [pertaining to Larimer wage rates], and W [pertaining to Weld wage rates], would be considered by the people in the areas covered by same." [25] The Union representatives responded as follows:

Union: Why aren't representatives of the Larimer and Weld Counties' area here? We would like to make it clear that we do not intend to travel into their areas to have them negotiate parts of this agreement. We consider that all negotiating concerning this agreement are [sic] carried on in this location at this table. If they have any interest in these matters, this is where the action is, this is where the things will happen and we don't intend to sit around for hours negotiating small parts and pieces of this agreement to satisfy their particular situations. Our representatives are here. This is where the decisions are made concerning the entire jurisdiction and if they are interested they should be here.[26]

Apparently the negotiating session ended at this point, with a date of December 22, 1966 being set for holding the next negotiating meeting. The trial examiner's findings of fact make no reference to whether a further meeting was ever actually held on this date, and the record is hazy on this point.

22. General Counsel's Exhibit No. 4, App. p. 328.

23. *See* note 12, *supra.*

24. *See* note 10, *supra.*

25. Respondent's Exhibit No. 10 p. 3, App. p. 366.

26. *Id.* at 4, App. p. 367.

Subsequent to the December 15th meeting, Hecht held a meeting with the Weld and Larimer contractors on December 21, 1966, presumably for the purpose of bringing the Weld and Larimer contractors up to date on the progress of negotiations. At this meeting, Hecht "read from the minutes"[27] the Union's statement quoted above. The Weld and Larimer contractors then voted to withdraw from NECA's December 1 Letter of Notice the proposals for revision of sections 6.18 L & W,[28] and they agreed to meet again if and when the Union specifically and formally requested negotiations concerning those sections. Hecht therefore wrote the Union on December 27, 1966 that NECA, "acting for and in behalf of the [Weld and Larimer contractors], do [sic] hereby in accordance with the decision of the majority of their number, withdraw the proposals * * * [made in its December 21, 1966 Letter of Notice, which pertained to sections 6.18 L & W]."[29] The letter further stated:

> You are assured *the employers herein referred to* stand ready to meet and discuss with your representatives any matters as would be considered to be of benefit and concern to the resident customers of our geographical industry whom we have long served.[30] [Emphasis supplied.]

What actually happened thereafter insofar as further negotiations are concerned does not appear from the trial examiner's findings of fact and is not clear from the record. The end result, however, was that NECA representative Hecht apparently negotiated a tentative agreement as to wages which was then presented by Hecht to the Weld and Larimer contractors at a meeting on January 27, 1967. The Larimer contractors there agreed among themselves to grant the wage increase negotiated by Hecht, which was to be added to the existing Larimer County wage scale under section 6.18 L, and the Weld contractors later agreed to the same wage increase to be added to the Weld County wage scale under section 6.18 W and so notified Hecht by telephone. However, final agreement with the Union on a number of issues including the issue of wages, was apparently never formally reached, and these unresolved issues were submitted to the Council of Industrial Relations for determination.[31] The Council decided that Weld and Larimer contractors were required to grant larger wage increases than the Denver area contractors but separate wage scales applicable to Weld and Larimer Counties were retained, and though the differential was now smaller the Weld and Larimer wages still remained lower than the Denver area wages.

The agreement which resulted from the 1966-67 negotiations and the Council's decision was by its terms to be effective as of April 1, 1967. However, NECA and the Union did not get around to signing a formal agreement until October 16, 1967. The agreement was styled as being "Amendments" to the previous agreement of April 1, 1965,[32] and the

---

27. Trial Examiner's Decision, 178 N.L.R.B. No. 108, p. 9 (1969), App. p. 10.

28. Under the terms of the contract then in effect for Larimer and Weld counties the existing terms and conditions would continue from year to year beyond the contract anniversary date unless either or both parties gave the required notice that a change was desired. *See* note 12, *supra.* Since the Union's Letter of Notice made no specific mention of sections 6.18 L & W, the contractors' action was presumably intended to withdraw the subject from negotiation unless and until a formal Letter of Notice specifically referring to sections 6.18 L & W was received from the Union. If no such Letter of Notice was forthcoming, the thought apparently was that the existing Weld and Larimer wage scales would automatically continue in effect for at least another year.

29. Respondent's Exhibit No. 11, App. p. 363.

30. *Id.*

31. *See* note 18, *supra.*

32. The reference to the April 1, 1965 agreement was to the agreement "as currently in effect," General Counsel's Exhibit No. 10 p. 1, App. p. 298, thus including the amendments after April 1, 1965 which

first sentence reads: "The amendments herein contained constitute such changes as were jointly *and locally negotiated* and those set forth in Decision No. 1309 of the Council of Industrial Relations dated February 17, 1967." [33] (Emphasis supplied.)

## IV. *The 1967–1968 Negotiations*

The Union initiated proceedings to alter the terms of the 1967 contract by a Letter of Notice mailed to NECA on November 29, 1967. The Letter contained specific proposals for eliminating the special wage scales applicable to Weld and Larimer Counties, and proposed a substantially higher wage scale to apply uniformly to all contractors in the 21-county area. NECA responded with proposals that also generally contemplated the substitution of some sort of more uniform wage scale. A negotiating meeting was held on December 28, 1967 between NECA and the Union, where the discussion centered largely on the wage scale situation in Weld and Larimer Counties. The Union advanced a proposal for uniform wages on all jobs where the "total electrical cost" [34] was in excess of $5000, while retaining a somewhat lower scale to be paid on jobs in Weld and Larimer Counties involving less than $5000. NECA indicated that it desired time to do some investigation as to the appropriateness of the $5000 dividing line for the split scale proposed by the Union, and further discussion of this subject was postponed for the time being.

NECA representative Hecht subsequently went to Greeley in Weld County, and to Fort Collins in Larimer County, where he "ascertained that a high percentage of the building permits in those counties were for work under $5000 in [electrical] cost." [35] At a negotiation meeting held on January 11, 1968 NECA and the Union then agreed to the split scale proposal suggested by the Union, with the $5000 figure as the dividing line, and the wages to be paid under each scale were settled upon.

Sometime in January of 1968 NECA representative Hecht met with Weld and Larimer contractors on two occasions.[36] At these meetings Hecht informed the contractors that the Union was refusing to bargain with NECA on matters as to Weld and Larimer Counties as separate groups and that the wages negotiated for the Denver area would apply to them as well. Some of the contractors present, including J–H Electric, indicated—in the trial examiner's words—"that they could not go along with that agreement." [37] No mention was made, however, about the Union's proposal as to a split wage scale to be applicable to Weld and Larimer Counties, and it does not appear that NECA communicated to the Union the contractors' reluctance to go along.

Within a few days after February 6, 1968 at the latest, J–H Electric received notice from NECA that an agreement had been reached, and the notice summarized the wage arrangement based on the split scale proposal. On March 27, 1968 J–H Electric contacted the Union by telephone, and indicated that J–H Electric had not been notified of the meetings at which the wage scale arrangements had been negotiated and could not go

brought the Weld and Larimer contractors within the one agreement.

33. General Counsel's Exhibit No. 10 p. 1, App. p. 298.

34. Trial Examiner's Decision, 178 N.L.R.B. No. 108, p. 11, App. p. 12.

35. *Id.*

36. The record is unclear as to the exact date of these meetings. The trial examiner found, however, that the meetings were held prior to the time that NECA and the Union reached final agreement on

a contract, and this finding is supported by substantial record evidence. The trial examiner concluded therefore "that the meetings must have been before the end of January." Trial Examiner's Decision, 178 N.L.R.B. No. 108, p. 12 n. 7, App. p. 13. But since it appears that the Union and NECA reached agreement on January 11, 1968 the meetings presumably were held prior to that date.

37. Trial Examiner's Decision, 178 N.L.R.B. No. 108, p. 12, App. p. 13.

along with the increases. The Union responded with a letter that stated the Union's view that J–H Electric had not rescinded the authorization of NECA to act as J–H Electric's bargaining representative, and that the Union considered J–H Electric to be bound by the terms of the agreement as negotiated. Since April 1, 1968 (the date the new contract was to be effective) J–H Electric has refused to pay the wage increases provided for by the agreement, and has refused to "make contributions to the Health Benefit and Vacation Funds required by the contract." [38]

## V. *The Trial Examiner's and the NLRB's Conclusions*

The trial examiner concluded that "[i]t is a reasonable inference from all the evidence that in the 1965 negotiations for a change in the bargaining pattern, the parties contemplated separate negotiations for Weld County contractors on wage rates and other economic issues and that the agreements reached in those negotiations were to be incorporated into 'exceptions' to the area agreement." [39] However, rather than relying directly on this conclusion in recommending that the complaint against J–H Electric be dismissed, the trial examiner further concluded that "[i]n the circumstances outlined above, the actions of the Union and NECA in denying to Respondent [J–H Electric] any meaningful opportunity to participate in the 1968 negotiations on matters affecting its economic life amounted, in my view, to a breach of faith on their part." [40] Applying equitable principles to the finding of a breach of faith, and citing *Industrial Engineer-*

*ing Co., Inc.,* 173 N.L.R.B. No. 18 (1968), the trial examiner recommended that the complaint be dismissed.

The NLRB in turn accepted the trial examiner's recommendation, relying however on the first conclusion reached by the trial examiner rather than the finding as to breach of faith. Said the Board, "[t]he fundamental question here is whether the Union contemplated, in the negotiations leading up to the 1968 contract, * * * that an individual variance would again be negotiated with respect to the Respondent Company [J–H Electric], as well as the other Weld County contractors." [41] The Board concluded that the Union had. in fact understood that the Weld County contractors retained, after the change in bargaining arrangements in 1965, the prerogative, established by the prior bargaining history, of negotiating separately concerning wages and related economic issues, and therefore that J–H Electric was entitled to refuse to be bound by a contract negotiated in derogation of that prerogative, citing *The Kroger Company,* 141 N.L.R.B. 564 (1963).

## VI. *Analysis and Conclusions*

 The broad legal principles which underlie the dispute in this case were settled by the decision in Retail Clerks Union, No. 1550 v. N.L.R.B., 117 U.S. App.D.C. 336, 330 F.2d 210 (1964). *See also* Western States Regional Council No. 3, International Woodworkers of America v. N.L.R.B., 130 U.S.App.D.C. 176, 179, 398 F.2d 770, 773 (1968). *Retail Clerks* affirmed the Board's conclusion in *The Kroger Company,* 141 N.L.R.B. 564

---

38. *Id.* at 13, App. at 14.

39. *Id.* at 14, App. at 15.

40. *Id.* at 15, App. at 16.

41. *J-H Electric,* 178 N.L.R.B. No. 108, p. 5 (1969), App. p. 22. In order to avoid any misunderstanding, the precise way in which the Board stated its conclusion bears immediate emphasis, anticipating somewhat the discussion which follows. Note that the Board casts its conclusion in terms of the Union's actual "contem-

plation." What the Union "contemplated" may differ subtly but importantly from what, for example, J-H Electric might be deemed to have given "notice" of (the term used in the dissenting opinion filed in this case). The Union might acquire a particular understanding, or "contemplation," based on any number of circumstances occurring over a long period of time, and not just based on the "notice" given by J-H Electric at any particular time.

(1963), that even in multi-employer bargaining situations a member or members of the multi-employer association may, under appropriate circumstances, reserve the right to bargain separately concerning particular subjects of collective bargaining. Where the particular factual circumstances warrant, a refusal to be bound by contractual terms negotiated in violation of such a reserved right is neither an unlawful interference with the collective bargaining rights of employees in violation of section 8(a) (1) nor a bad faith refusal to bargain with the union in violation of section 8(a) (5). As *Retail Clerks* makes clear, the key question is whether from all the facts the Union actually contemplated, or reasonably should have contemplated, that the subject in question was reserved for separate bargaining.

■ The Board in the present case has squarely relied on the principle recognized in *Retail Clerks,* and has made precisely the determination required to support the application of that principle. The Board concluded that "the Union contemplated, in the negotiations leading to the 1968 contract, * * * that an individual variance would again be negotiated with respect to the Respondent [J-H Electric], as well as the other Weld County contractors." [42] The narrow question for decision then is whether the Board's factual conclusion as to what the parties—more particularly the Union—in fact contemplated is supported by substantial evidence on the whole record.[43]

---

42. *Id.*

43. Section 10(f), National Labor Relations Act, 29 U.S.C. § 160(f) (1964); Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

The Union also assails the Board as having decided the case on a rationale not presented in the hearings before the trial examiner, and not relied on by the trial examiner in reaching a decision. This is asserted to be an additional reason for overturning the Board's decision. Western States Regional Council No. 3, International Woodworkers of America v. N.L.R.B., 125 U.S.App.D.C. 1, 365 F.2d 934 (1966). Before the trial examiner, J-H Electric's primary position was that it was not a member of a multi-employer group consisting of all union contractors in the 21-county area, but the trial examiner explicitly found that after 1965 J-H Electric was a member of such a multi-employer group and this conclusion was not disturbed by the Board.

However, at the hearing before the trial examiner, J-H Electric also advanced an alternative theory in its defense, and there was considerable discussion in an attempt to pin down exactly what the theory was. *See* the transcript of the hearings before the trial examiner, App. pp. 136–147, especially App. p. 147 where the following is set forth:

"TRIAL EXAMINER: Let's see if I've got your theory straight, Mr. Schoeberlein [counsel for J-H Electric]. Your contention is that despite the fact that there was this letter of assent signed on March 2nd, 1966, and after there had been a cancellation of the separate agreement for Weld County and after all the contractors were covered by one contract, is your contention that there still was an understanding of the parties that negotiations for Weld County would be separate?

MR. SCHOEBERLEIN: Yes. * *" Thus, the precise theory on which the Board decided the case was raised before the trial examiner, and furthermore was developed by the trial examiner in his written decision. *See* the discussion in the text at p. 1136, *supra.*

It is important to appreciate fully the very narrow scope of the issue as perceived by the Board in reaching its conclusion. The Union has sought to characterize the Board's action as permitting unfettered "withdrawal" from multi-employer bargaining, and the dissent speaks in terms of there being no evidence "of a withdrawal of NECA's authority to negotiate wages with the Union." This misconceives the issues raised by the facts in this case and by the Board's holding. The Board did not hold that J-H Electric could "withdraw" from multi-employer bargaining; in fact, the proceedings before the Board never drew in question the obligations of J-H Electric under the contract as to non-wage matters. All the Board held was simply that there was a continuation of prior limitations on NECA's bargaining authority as to Weld wages—understood by the Union—after the Weld contractors came under the Denver agreement, and not that there

The first circumstance which bears *directly* on the Union's understanding occurred during the 1966–67 negotiations, the first negotiations to take place after the Weld and Larimer contractors came within the larger multi-employer association in 1965. It was at the first bargaining session in 1966 that the Union was informed by NECA that "[i]t is understood that Section 6.18 L and W, would be considered by the people in the areas covered by same." [44] The Union's response to this was, in part at least, entirely consistent with an acceptance of that proposition. Thus, the Union demanded to know "[w]hy aren't representatives of the Larimer and Weld Counties' area here?" [45] One permissible implication to be derived from this statement is that if they had been there the Union would have acknowledged the Weld and Larimer contractors' right to negotiate with the Union concerning Weld and Larimer wages. Also, the Union stated "[w]e would like to make it clear that we do not intend to travel into their areas to have them negotiate parts of this agreement." [46] The Union did not assert that the Weld and Larimer contractors were not entitled to negotiate parts of the agreement, but simply that the Union wasn't about to meet separately in their own geographical areas to do so.

Secondly, when the Union's response immediately above was conveyed by NECA to the Weld and Larimer contractors, they instructed NECA to withdraw the proposals previously made concerning Weld and Larimer wages. When NECA did so, it stated in its letter to the Union that it was "acting for and in behalf of the Weld and Larimer County contractors * * * and in accordance with the decision of the majority of *their* number * * *," and further that:

> You are assured *the employers herein referred to* [the Larimer and Weld County contractors] stand ready to meet and discuss with your representatives any matters as would be considered to be of benefit and concern to the resident customers of our geographical industry whom we have long served. [47] [Emphasis supplied.]

So far as the record discloses, this drew no reaction, comment or question from the Union, neither to NECA nor the Weld and Larimer contractors, which might have been expected if the Union was operating on the understanding that NECA had complete authority to bargain for and bind the Weld and Larimer contractors on these matters.

Thirdly, when it came time to reduce to writing the final agreement reached in 1966–67, the first sentence of the agreement read: "The amendments herein contained constitute such changes as were jointly *and locally negotiated* and those set forth in Decision No. 1309 of the Council of Industrial Relations dated February 17, 1967." [48] (Emphasis supplied.) This certainly lends support to an inference that the Union was aware of the continuing importance of, and accepted the practice of, local negotiations as to certain matters. It would at least be consistent with a Union understanding

was a permissible withdrawal of *existing* bargaining authority.

The existence of prior contracts between the parties is not evidence of the existence of the contract here alleged because here the prior contracts had special provisions which the union argues had been bargained away in the existing contract. This case, thus, is rather an attempt by the Union to establish the existence of a contract with certain provisions through proof of prior authority of the agent to negotiate a contract with different provisions. The authority of an agent cannot be so twisted. The authority exercised by the agent

in allegedly agreeing to the existing contract went beyond the general plan of negotiation authorized and exercised in agreeing to the prior contracts. *Cf.* 2 Wigmore, Evidence § 377 (3d ed. 1940).

44. Respondent's Exhibit No. 10 p. 3, App. p. 366.

45. *Id.* at 4, App. at 367.

46. *Id.*

47. Respondent's Exhibit No. 11, App. p. 363.

48. General Counsel's Exhibit No. 10 p. 1, App. p. 298.

that local negotiations were not totally out of the picture.

Finally, some indication of the Union's understanding may arise from the fact that, at all joint negotiating committee meetings between the Union and contractor representatives during the 1966–67 and 1967–68 negotiations, all the contractor representatives present were from the Denver area. If, as is now claimed, the Union at that time had been of the understanding that what was agreed to at those meetings would be binding on the Weld and Larimer contractors, surely the Union would have thought it strange that no representatives from those areas were among the contractor representatives.[49] Yet, so far as appears from the record, no mention was made of this by the Union except the one time, during the 1966–67 negotiations, when it was indicated to the Union that Weld and Larimer wages would have to be taken up with the contractors from those areas. As previously discussed, the Union's response at that time is not entirely favorable to its present position. Perhaps the significance to be derived from the Union's failure to react in a more affirmative fashion is not substantial, but it does lend some additional credence to the reasonableness of the Board's conclusion.

The significance of these indications of Union understanding must of course be evaluated within the context of all the circumstances of the relationship between the Union and the Weld and Larimer contractors. The peculiar economic situation involving Weld and Larimer contractors, as contrasted with the situation in the 19-county area, was well known to everyone involved, including the Union. The Union was thus at all times aware of the sensitive nature of the question of a wage differential for Weld and Larimer Counties, and well

knew that the interests of the Denver area contractors were opposed to the existence of a differential. In short, the question of Weld and Larimer wages was one the Union would reasonably expect to be a special one, even after the 1965 change in bargaining circumstances. Viewed in this light, the indications of Union understanding outlined above take on added meaning, and certainly furnish substantial support for the conclusion reached by the Board.

Although looking at just this much of the record the Board's conclusion is supportable, if there is enough additional evidence pointing to a contrary conclusion it may yet be that the Board must be reversed. It is on this ground that the Union constructs its strongest argument. The Union points to numerous facts in the record which it asserts can be marshaled to make a strong case for the proposition that the Union in fact always had the understanding, after 1965, that Weld and Larimer contractors no longer were entitled to bargain separately concerning the question of wages in Weld and Larimer Counties. The Union's argument must be that the record evidence to this effect is so overwhelming that the Board's contrary conclusion is deprived of substantial evidence *on the whole record*. Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

The most significant and unambiguous facts relied on by the Union are supplied by the "Bargaining Authorization Agreement" and "Letter of Assent" executed by J–H Electric in 1965.[50] Assertedly, these documents constitute a clear and unequivocal expression to the Union that NECA was the "collective bargaining representative for all matters contained in the Agreement or pertaining to this Agreement,"[51] and that the Union must

---

49. For example, the very first proposals for bringing Weld County within the Denver contract had included the following proposal:
 "B. The Rocky Mountain Chapter [NECA] will appoint a resident contractor of Weld County to act as ad-

visor to the area Negotiating Committee."
 *See* text at p. 1130, *supra.*

50. *See* p. 1132, *supra.*

51. General Counsel's Exhibit No. 3, App. p. 329.

as a result be considered as having understood just exactly what the "Letter of Assent" said—that "all matters" henceforth were to be taken up with NECA, and not with the Weld and Larimer contractors separately. This of course is what the literal wording does seem to say.

At the outset, however, it must be recognized that the question is not what the Letter of Assent itself said, but what the Union understood. First, there was no Letter of Assent executed following the 1967–68 negotiations, and more importantly the Complaint issued by the General Counsel in this case was one for violation of the National Labor Relations Act, not for breach of contract. That the Union did not understand the situation to be controlled by the literal wording of the Letter of Assent is suggested by a number of things. As previously discussed, for example, during the 1966–67 negotiations when NECA stated to the Union that "[i]t is understood that Sections 6.18, L & W, would be considered by the people in the areas covered by the same," the Union's response was somewhat equivocal. The Union did not simply assert that under the Letter of Assent all bargaining was in the hands of NECA, as it might have

been expected to do if that was the Union's understanding.

The significance which the Union may have attributed to the Letter of Assent and Bargaining Authorization Agreement must also be evaluated against the backdrop of the larger context of relations between the parties involved. The entire history of bargaining practices, as revealed by the record, is characterized by a marked degree of informality and disregard for formal writings,[52] and by a general lack of preciseness and thoroughgoing attention to detail in the writings involved.[53] For example, neither the Bargaining Authorization Agreement in question nor any of the collective bargaining agreements in effect over the years spell out the exact authority of the Joint Negotiations Committee,[54] or define the binding effect of an agreement reached by the Committee.[55] Significantly, even during the 1967–68 negotiations giving rise to the present case, despite the 1965 Letter of Assent and Bargaining Authorization Agreement the Union engaged in a "good deal of discussion concerning the differences in functions and responsibilities of our respective committees concerning negotiating responsibilities and authority." [56] With all this in mind, the Union's actual under-

---

**52.** For example, the contract which was to be effective as of April 1, 1967 was not formally signed by NECA and the Union until October 16, 1967, some six and a half months later. *See* discussion in the text at p. 1134 *supra.*

　　Also the record indicates that the Union obtained a Letter of Assent from J-H Electric following negotiations for the last separate Weld County contract in 1963, and also following the 1965 negotiations. But the Union made no attempt to obtain such a Letter of Assent after either the 1966–67 or 1967–68 negotiations, and it appears that the Union's practice was spotty in this respect.

**53.** As so often the case in multi-employer bargaining, at least the employers in the present case are small, unsophisticated in labor matters, and generally without the benefit of continuing advice of counsel. *See* transcript of the hearings before the trial examiner, App. pp. 73, 149.

**54.** *See* notes 9 & 10, *supra.*

**55.** It appears, however, to have been the consistent practice to submit any agreement arrived at by the Negotiations Committee, or by NECA representative Hecht, for approval by a majority vote of those contractors involved. *See, e. g.,* General Counsel's Exhibit No. 12, App. p. 290; Respondent's Exhibit No. 17, App. p. 341; Respondent's Exhibit No. 16, App. 347.

　　Compare the Bargaining Authorization Agreement in the present case with the ones involved in Western States Regional Council No. 3, International Woodworkers of America v. N.L.R.B., 130 U.S.App. D.C. 176, 180 n. 3, 398 F.2d 770, 774 n. 3 (1968); N.L.R.B. v. Jeffries Banknote Co., 281 F.2d 893, 894 n. 1 (9th Cir. 1960).

**56.** Respondent's Exhibit No. 16, App. p. 347.

standing when it approached post-1965 negotiations may well have been contrary to what it might legitimately have understood from the language of the Letter of Assent and Bargaining Authorization Agreement.

A second record fact which supports the Union's present position comes from the Union's response, in the 1966–67 negotiations, to NECA's assertion that "[i]t is understood that Sections 6.18, L and W, would be considered by the people in the areas covered by the same." [57] In addition to the statements previously discussed,[58] which lend themselves to a conclusion that the Union did not reject out of hand the right of the Weld and Larimer contractors to bargain separately on wages, the Union also said: "If they [Weld and Larimer contractors] have any interest in these matters, this is where the action is, this is where the things will happen *and we don't intend to sit around for hours negotiating small parts and pieces of this agreement to satisfy their particular situations.*"[59] (Emphasis supplied.) Standing by itself, the emphasized portion of the statement is a fairly unambiguous indication that the Union did not feel that it was obligated to bargain separately with the Weld and Larimer contractors on wages or anything else. Yet this statement was made in the same breath with other statements, previously discussed, which cut the other way. When read in entirety and in context, it can fairly be said that the Board reasonably could draw *either* of the opposing inferences which the Union's entire statement supports.

An additional circumstance which favors the Union's position arises from the fact that after 1965 the Weld and Larimer contractors never actually met the Union in face-to-face negotiations, and never made a formal demand to meet with the Union on such a basis. Since all dealings after 1965 concerning the Weld and Larimer wage situation were carried on through the auspices of NECA, it would be logical for the Union to understand that NECA was the party to deal with. But two factors weaken, if not destroy, the logic of this position. First, even prior to 1965 it was not uncommon for actual bargaining to be carried on solely through NECA representative Hecht.[60] Agreements were reached without face-to-face bargaining between the Union and Weld and Larimer contractors, but it seems that it was understood that the contractors, or a majority of them, still reserved the right to accept or reject the agreement reached by NECA and the Union, just as the agreement was subject to ratification by majority vote of all Union members.[61] Second, during the 1966–67 negotiations when controversy over this point arose, NECA wrote a letter to the Union withdrawing proposals as to Weld and Larimer wages, and the letter explicitly stated that in doing so NECA was "acting for and in behalf of the Weld and Larimer County contractors * * *" and that "the employers herein referred to" stood ready to meet with the Union.[62] This was an indication to the Union that the Weld and Larimer contractors were retaining, or at least thought they were retaining, final control on wage matters pertaining to their areas.

When all the facts of record which support the Union's position are examined, both separately and as a whole, the case for reaching a conclusion contrary to the one reached by the Board is not weak. However, it can not fairly be said that

57. *See* p. 1133, *supra.*

58. *See* p. 1138, *supra.*

59. Respondent's Exhibit No. 10 p. 3, App. p. 366.

60. *See, e. g.,* note 9, *supra*; transcript of the hearings before the trial examiner, App. p. 179; General Counsel's Exhibit No. 19 p. 2, App. p. 258 ("[The Weld County contractors] and/or their undersigned representative are willing to meet with your committee and/or its representative at such time as is reasonable * * *").

61. *See* note 55, *supra.*

62. Respondent's Exhibit No. 11, App. p. 363; *see* text at p. 1134, *supra.*

the drift of all the evidence is so overwhelmingly in the Union's favor as to entirely deprive the Board's contrary conclusion of the support of substantial evidence on the whole record. There remains room for reasonable disagreement. It must also be recognized that the trial examiner, who enjoyed the position of closest intimacy to the facts of this case, was in general agreement with the Board's conclusion, cf. Western States Regional Council No. 3, International Woodworkers of America v. N. L. R. B., 130 U.S.App.D.C. 176, 181, 309 F.2d 770, 775 (1968), and the expertise of the Board and the trial examiner weigh heavily in support of their conclusions. We are impressed from the entire record that there is not adequate proof,[63] in the context of the substantial evidence test, that the Union understood that NECA was authorized to enter into a binding contract as to wages and economic issues for J–H Electric and the other Weld contractors without their final approval.

Thus, even though a reviewing court might have some doubts about the Board's conclusions, on this record the limitations of the applicable standard of review require that "the Board's specialized judgment * * * concerning multi-employer bargaining * * *"[64] be affirmed.

So ordered.

LEVENTHAL, Circuit Judge (dissenting):

I had originally thought that this was the case dreamed of by law school professors, a case where I could conscientiously say that although I considered the findings "clearly erroneous," so that I would have voted to reverse if the decision had been rendered by a trial court, nevertheless there was support in "substantial evidence," so that I should vote to affirm because the determination was made by an administrative agency.

On further reflection I do not see "substantial evidence" supporting the agency's determination. The case in es-

---

63. Although the Board in its decision did not rely in any way on a burden of proof mechanism, the Board might have been warranted in doing so. In J & H Food Inc., 139 N.L.R.B. 1399 (1962), the Board adopted in its entirety the Trial Examiner's Intermediate Report and Recommended Order, which held in part:

"If in the future the agreement reached in joint bargaining negotiations is not to be subject to separate bargaining for such variations as Respondent and others have negotiated for in the past, *it is up to the Union and the employers to make this clear* from the outset of the negotiations."

139 N.L.R.B. at 1405 (emphasis supplied). In an area as complex and as consensual in nature as is multi-employer bargaining, a requirement that a party claiming that rights have been relinquished or acquired bear the burden of showing unequivocally that such is the case would not seem to be an unreasonable one. Cf. Detroit Newspaper Publishers Ass'n v. N.L.R.B., 372 F.2d 569, 572 (6th Cir. 1967).

In substance the present case, although distinguishable from the situation involved in *J & H Food Inc., supra*, would support the application of just such a principle. The Union is claiming that by the events

of 1965 the Weld and Larimer contractors relinquished their past prerogative of bargaining separately on the question of wages, and would thus be bound by the outcome of the negotiations between the Union and the larger multi-employer association. For this to be the case, it would not seem to be unreasonable to require that it be made perfectly clear to all concerned that this was the understanding. As should be clear at this point however, the record in this case suggests that the understanding of both parties may well have been murky as to what course negotiations were to take after 1965.

The Board itself recognizes the force of this reasoning in its brief filed in this case, when it states at p. 22 that "the effect of the Board's decision is to encourage parties to multi-employer bargaining to make specific inquiries about whether previously asserted rights have been waived for purposes of current negotiations."

64. N.L.R.B. v. Truck Drivers Local 449, 353 U.S. 87, 96, 77 S.Ct. 643, 647, 1 L. Ed.2d 676 (1957); see also Retail Clerks Union, No. 1550 v. N.L.R.B., 117 U.S. App.D.C. 336, 342 n. 5, 330 F.2d 210, 216 n. 5 (1964).

sence is this: An employer has given an agent (Rocky Mountain Chapter, National Electrical Contractors Association, Inc. (NECA)) authority to negotiate a collective bargaining agreement, on its behalf. This is separately executed but given as part of the agent's broader authority to negotiate for a large multi-employer group (Regional Association) and also for a smaller sub-group (Larimer County and Weld County employers) which includes this employer (J–H Electric). After extensive bargaining an agreement was signed by the agent in behalf of all employers in the group; it had special provisions addressed to the special situation of the sub-group. Now the employer refuses to abide by the agreement signed by the agent in his behalf and claims that he may do so without violating his duty of collective bargaining, because there was notice to the Union, limiting the broad authority given to the agent in writing, that there would be separate negotiations between the Union and employers in Larimer and Weld Counties.

I do not see any tenable basis for the Board's ruling accepting this contention of J–H Electric. I see no substantial evidence of any such limitation on the agent's authority, vis-a-vis the Union, to sign an agreement binding on all members of the multi-employer group (with special substantive provisions for this sub-group).

The Board was undoubtedly troubled by the fact that this employer sought to give a direction to this agent which was not followed. But that was not disclosed to the Union and did not undercut the agent's authority so far as the Union was concerned. Let us suppose the Union, after signing the master agreement, had called for further bargaining with this employer to get better terms and threatened a strike. Would the Board really have held that it was always understood that there would be separate negotiation with the Larimer-Weld employees, and hence the Union was justified in holding the master agreement inapplicable? I have no doubt that the Board

would have considered this impermissible, and rightly so. This employer's course is likewise not supportable, and neither is the Board's decision supporting it.

1. I begin my quest to see whether there was substantial evidence to support the Board's decision, by noting and emphasizing that the Larimer and Weld County employers gained a substantial economic benefit from joining in the bargaining and agreements negotiated by the Regional Association. What this meant to them was that they could come into Denver, a market of no little consequence, and do jobs there with their customary employees, without hiring a new staff. There is not a scintilla of evidence that the employers in these counties intended to break off from the multi-employer group and lose the economic benefits which they obtained by joinder with this Regional Association. They did not notify the Union they pulled out of the group or limited the authority of the Association or Mr. Hecht.

2. All of the evidence relied on by the majority of the Board and the majority of this court established only an awareness by the Union that there were to be differences in substantive provisions for these counties.

I would certainly agree that the Union may fairly be charged with knowledge that there would be different circumstances pertaining to Weld and Larimer counties. Apparently these once rural counties, though becoming industrialized, were in a period of transition that still left them significantly different from Denver. However, the 1968 Agreement signed by the Association, and by Mr. Hecht, did make a distinction for work done in these counties.

What is entirely lacking in all the evidence—and this is crucial!—is any evidence of awareness by the Union that the substantive differences were to be communicated to the Union by, or had to be bargained by the Union with, any channel other than the authorized Agent, Hecht and NECA. The Union would of course understand that Mr. Hecht would

not conduct his bargaining in behalf of the Larimer and Weld employers without consulting with them. To expedite matters they could attend the bargaining session. Still, any differences necessary for them were to be communicated to the Union, by Mr. Hecht (as in 1966/67) ; or perhaps by the employers (a point we take up below), but in any event prior to signing of the joint agreement.

The Board failed, and the majority of this court fail, to distinguish between any reservations of the Larimer and Weld County employers as to matters of substance, and the issue of procedure for being bound by one's agent, and for withdrawing his authority.

3. If there were evidence that the Union knew that the NECA, or Mr. Hecht, had departed from the instructions given them by the Larimer and Weld County employers, we would have the very different question whether there was a breach of fiduciary duty, and whether the Union was privy thereto and so acted in bad faith in its bargaining. There is no finding as to that. Hence any such possibility is unavailable to support the Board's order, see S. E. C. v. Chenery, 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1943). Since the Board expressly disclaimed adoption of the Examiner's finding on this point, this is not a mere technicality.

4. Looking further into the record there are two solid facts that vitiate the Board's conclusions.

The first is that the 1966 Letter of Assent and the Bargaining Authorization Agreement transmitted to the Union both state on their face, in unqualified terms, that NECA is and shall continue to be the bargaining agent and representative for J–H Electric, subject to provision for revocation never invoked.[1]

The second fact is that there was no direct bargaining between the Union and J–H Electric after July 15, 1965, eight months prior to the signing of the Assent and the Authorization.

In view of these stark facts I do not see how the Board could say that "the Union had *no* reason to believe that Respondent Company intended to abandon its prior practice of bargaining separately with the Union regarding wage rates in Weld County." These facts plainly established a basis for the Union to believe that the company was abandoning the practice of separate bargaining on these issues. The Board's finding that the Union had no reason to believe this is without support in the record.

5. In an attempt to find support for the Board's conclusion, my brethren cite the Union's response to a statement by NECA representative, during the 1966 bargaining session, that "Section 6.18 L and W, would be considered by the people in the areas covered by same." The Union's answer was as follows:

"Why aren't representatives of the Larimer and Weld Counties' area here? We would like to make it clear that we do not intend to travel into their areas to have them negotiate parts of this agreement. We consider that all negotiating concerning this agreement are carried on in this location at this table. If they have any interest in these matters, this is where the action is, this is where the thing will happen and we don't intend to sit around for hours negotiating small parts and pieces of this agreement to satisfy their particular situation. Our representatives are here. This is where the decisions are made concerning the entire jurisdiction and if they are interested they should be here." (Resp. Ex. 10, App. 367.)

The majority infer from parts of the statement that "if they had been there the Union would have acknowledged the Weld and Larimer contractors' right to

---

1. The Bargaining Authorization Agreement signed by the employers and transmitted to the Union provided that an employer could withdraw on 60 days notice, except that the Agreement, being coupled with an interest, was irrevocable without consent during the period between December 1 and April of the following year.

negotiate with the Union concerning Weld and Larimer wages." This has no materiality. The Union likely understood that NECA and Hecht would consult with the Larimer and Weld contractors about provisions of particular significance to them. And it is only good sense, if those Larimer and Weld contractors are interested, that they should be right there while the discussions are going on, observing and even participating. But the ability of Larimer-Weld contractors to participate with their agent, Mr. Hecht and the Association, in the negotiations does not mean that they had the authority to stay away and disavow the agreement their agent signed as a result of the negotiations. Furthermore, there is not one shred of evidence—not in the above statement or anywhere else—that the Union understood the participation of these contractors to be a prerequisite to the formation of a binding agreement with NECA covering wage rates in the two counties. The Board either failed to see or chose to ignore that it was converting an option into a requirement. This critical flaw in the Board's analysis is perpetuated by the majority's affirmance.

6. The majority next seek to support the Board's order by citing the fact that when the Union's position—the above-quoted passage—was conveyed to the Weld and Larimer contractors by NECA in January, 1967, the contractors instructed their agent to withdraw the proposals previously made concerning wage rates in those counties. The majority emphasizes that when NECA did so, it told the Union that it was "acting for and in behalf of the Weld and Larimer County contractors," and that "the employers herein referred to stand ready to meet and discuss [these matters] with your representatives." This, the majority states, is sufficient to put the Union on notice that the contractors did not intend to be bound by NECA on the Weld and Larimer wage rates. But when the Agent himself withdraws an offer, prior to signing the agreement, announcing

that he is doing this in view of the wishes of his principal, he does not indicate a limitation or revocation of his agency. He rather indicates a responsible exercise of his agency. In this case within a matter of weeks agent Hecht again met with the Union and reached a tentative agreement as to wages, including wages to be paid by the Weld and Larimer contractors, which stood up without any Union bargaining with those contractors.

The majority say that it is not clear from the record exactly what happened in December 1966 and January 1967. What is emphatically clear from the record is that in 1967 the Union reached a tentative agreement *with Hecht* concerning the special provisions applicable to Larimer and Weld Counties. When the Larimer and Weld contractors agreed to grant the wage increases negotiated by Hecht they "informed Hecht by telephone," as the majority says. There is not a line of proof, not a word of findings, that the contractors informed the Union. There was nothing to depart from the bargaining authorization given to NECA and Hecht. To the extent that Mr. Hecht stayed with the "tentative" agreement he signed with the Union, after getting the go-ahead from the Larimer and Weld County employers, it was Hecht who told the Union so. To the extent that Hecht did not stay with his tentative agreement, the matter was submitted to the Council of Industrial Relations,—an employer-union committee that is tantamount to an ad hoc arbitration.

I fail to see how the majority can find substantial evidence of a withdrawal of NECA's authority to negotiate with the Union on wages for Larimer and Weld County employers when almost immediately NECA did negotiate on wages payable by Weld-Larimer contractors and reach an agreement on this matter.

7. The 1967 events included the following: NECA reached a partial agreement with the Union; some of the issues were referred to arbitration; the ultimate 1967 agreement, arrived at by the arbitrating Industrial Relations Council,

contains a recital that it was "jointly and locally negotiated." I don't think it can be seriously put that a mere recital of to sign a contract in behalf of Weld-Larimer employers. I do not believe it is seriously contended, by the Board, its counsel, or the majority of this court, that there was in fact any local negotiation between the Union on the one side and Larimer or Weld contractors themselves on the other. There is not an iota of evidence that there was any such local bargaining.[2]

The recital may mean that there was local discussion of substantive issues with the Weld and Larimer employers by the NECA's Mr. Hecht. That is a fact, and it appears in the record. Or the recital may refer to local negotiations in the area covered by the ad hoc arbitration. Whatever it referred to, I don't see how it can operate to limit the agent's authority in absence of any evidence that negotiations were in fact conducted by the principal.

8. The majority says that "there was no Letter of Assent executed following the 1967–68 negotiations." However, it is clear from the face of both documents that the appointment of NECA as bargaining agent "for all matters contained in this Agreement" was to remain in effect "until terminated by written notice." In view of this language, and the undisputed fact that no written notice of termination was ever sent to the Union, I fail to see how NECA's authority as bargaining agent was undercut merely because it was not re-executed. The 1967 and 1968 agreements were avowedly signed as "Amendments" to the 1965 pact, not as wholly new agreements. The Letter of Assent, by its very terms, authorized NECA to negotiate amendments concerning "matters contained in" the original agreement. The majority's assumption to the contrary is without support in the record.

9. The law is focusing sharply and vigorously on the responsibilities of the parties engaged in multi-employer collective bargaining. A union may not validly threaten to strike individual members of the group in order to force them to withdraw bargaining authority from the association. Int'l Union of Operating Engineers, Local 825, 145 N.L.R.B. 952 (1964). If such a strike takes place the members of the group can take effective action to preserve the group bargaining. N. L. R. B. v. Truck Drivers Union, 353 U.S. 87, 77 S.Ct. 643, 1 L.Ed.2d 676 (1957). This can extend so far as to permit to a lockout of regular employees with the hiring of temporary replacements to continue operation. N. L. R. B. v. Brown Food Store, 380 U.S. 278, 85 S.Ct. 980, 13 L.Ed.2d 839 (1965).

I do not see how an individual employer or sub-group of employers can be allowed to disengage from the bargaining group, before or after the agreement is signed, unless the operative ground rules are observed. If there are any rules that must be followed strictly they are the ones concerning bargaining authority. Indeed, a union is held to the "apparent" bargaining authority of an official who did not have authority in fact. United Steelworkers of America v. CCI Corp., 395 F.2d 529 (10th Cir. 1968), cert. denied, 393 U.S. 1019, 89 S.Ct. 627, 21 L. Ed.2d 564 (1969). Actual and written authority to a bargaining agent cannot be undercut by anything less than a clear showing that what exists on paper is only a paper authority that does not conform to substance and fact. I see no substantial evidence in this record to support that conclusion.

I respectfully dissent.

---

**2.** It is hard to conceive that if any such bargaining had taken place there would have been no evidence of that. Obviously the burden was on respondent employers, having possession of the evidence, to prove this positive fact if it did exist; the burden cannot be meaningfully or fairly put on the Board or Union counsel to go beyond the written power of authority and produce evidence of a non-happening.

On Petition for Rehearing

### ORDER

PER CURIAM.

On consideration of petitioner's petition for rehearing, it is

Ordered by the Court that petitioner's aforesaid petition is denied.

Separate statement of Circuit Judge MacKINNON as to why he voted against rehearing:

Judge MacKinnon would note that the petitioner misreads the opinion of the Court in this case, as the Court certainly does not hold that J–H Electric as an individual contractor could refuse to be bound for reasons peculiar to itself alone. Although J–H Electric is sometimes spoken of individually, it is clear from the opinion as a whole that all the Weld County contractors are in the same position. The Board found that for reasons derived from the circumstances as they involved the Weld County contractors as a group, J–H Electric could refuse to be bound by the contract in question. The Court simply affirmed the Board on this point.